[L.A. No. 31266. Feb. 18, 1982.]

GERALD HAY KILGORE, Plaintiff and Appellant, v.
EVELLE J. YOUNGER, as Attorney General, etc., et al., Defendants
and Respondents.

**COUNSEL**

James Edward Green for Plaintiff and Appellant.

Fred Okrand, Mark D. Rosenbaum, Terry Smerling, Floyd J. Siegal, Stanley I. Greenberg, Margaret C. Crosby, Alan L. Schlosser and Amitai Schwartz as Amici Curiae on behalf of Plaintiff and Appellant.

George Deukmejian, Attorney General, Robert H. Francis, Deputy Attorney General, Robert C. Lobdell, Gibson, Dunn & Crutcher, Robert S. Warren, Robert A. Rizzi, Flint & MacKay, Stephen G. Contopulos and Frank Gooch III for Defendants and Respondents.

## OPINION

**RICHARDSON, J.**—Plaintiff Gerald Hay Kilgore appeals from a judgment of dismissal of his action to recover damages for alleged defamation, intentional infliction of emotional distress and invasion of privacy by defendant Evelle J. Younger, as Attorney General of California, and by various news media defendants. We will affirm the judgment.

In his complaint plaintiff alleges that in July 1977, while Attorney General, defendant Younger established an eight-member commission named The Organized Crime Control Commission (Commission) within the California Department of Justice to study organized criminal conspiracies within the state and to assess the effectiveness of existing criminal procedural controls. The Commission conducted private hearings at which it received the testimony of public officials and confidential informants. It also gathered data from "criminal offender record information," as defined in Penal Code section 11075, and "state summary criminal history information," within the meaning of Penal Code section 11105, relating to approximately 292 persons.

On May 2, 1978, the Commission formally delivered to defendant Younger its written report listing the names of 92 persons suspected of involvement in a wide variety of organized criminal activity in the state, including bookmaking, labor racketeering, loan sharking, extortion, theft, fraud, dealing in narcotics, drugs, and stolen property, arson, prostitution, pornography, and murder. Specifically with respect to plaintiff, the report included his name, residence address, picture and the following personal information: "Kilgore owns and operates a wire service in the Los Angeles area that provides information on sporting events to bookmakers in California and throughout the United States. His company has 15 telephones that provide free information concerning sporting events on a 24-hour basis. During 1976, his company had a $590,000 telephone bill. Kilgore has associated with many bookmakers

throughout the country and has been convicted of bookmaking in 1962 and 1975. On May 10, 1977, he was sentenced to 14 months in federal prison for conspiracy to commit wire fraud."

On the day the report was delivered, Younger and two Commission members held a press conference during which he distributed copies of the report to members of the news media and announced that he had adopted the report. Plaintiff was identified by name in the Los Angeles Herald Examiner on May 2, 1978, and in the Los Angeles Times on May 3, 1978, as being among the 92 persons included in the commission's report, without tying him to any specific organized criminal activity. Thereafter, plaintiff unsuccessfully sought from the media defendants either a correction or retraction of the stories. (See Civ. Code, § 48a.)

On August 9, 1978, plaintiff commenced this action seeking damages and other appropriate relief for defamation, intentional infliction of emotional distress and invasion of privacy. Named and served as defendants were: Attorney General Younger; the Hearst Corporation, which publishes the Los Angeles Herald Examiner, reporter Mike Quall and publisher Frances Dale; the Times Mirror Corporation which publishes the Los Angeles Times, reporter Bill Farr and publisher Otis Chandler.

Each of the defendants demurred to the complaint on the ground, inter alia, that the publication of the information was privileged. The trial court sustained the demurrers without leave to amend and dismissed the action as to all defendants. (See Code Civ. Proc., § 581, subd. 3.) This appeal followed.

Because we conclude a portion of the opinion of Justice Bernstein for the Court of Appeal, Second Appellate District, Division Five, thoughtfully and correctly treats the issue of the legal efficacy of plaintiff's allegations, we adopt that portion of her opinion as our own. The Court of Appeal opinion, with appropriate deletions and additions,* is as follows:

---

*Brackets together, in this manner [], are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than the editor's parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court. (*Estate of McDill* (1975) 14 Cal.3d 831, 834 [122 Cal.Rptr. 754, 537 P.2d 874].)

## THE MEDIA DEMURRERS

[] [T]he media—that is all defendants except Younger—premised their demurrers on the privilege afforded by subdivisions 4 and 5 of section 47 of the Civil Code: "A privileged publication or broadcast is one made—

" . . . . . . . . . . . . . .

"4. By a fair and true report in a public journal, of (1) a judicial, (2) legislative, or (3) other public official proceeding, or (4) of anything said in the course thereof, . . .

"5. By a fair and true report of (1) the proceedings of a public meeting, if such meeting was lawfully convened for a lawful purpose and open to the public, or (2) the publication of the matter complained of was for the public benefit." A parallel privilege contained in the Restatement Second of Torts reads in relevant part as follows: "The publication of defamatory matter concerning another in a report of . . . a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported." (*Id.*, § 611.)

■ Clearly, section 47, subdivision 5, provides an adequate basis on which to uphold the trial court's ruling. It cannot be gainsaid that as far as the press was concerned, the news conference was a legally convened public meeting for a lawful purpose to which the public—by way of the media—had been invited. []

Somewhat more troublesome, however, is the accompanying requirement of [subdivision] 5 that the media articles be "fair and true" reports. Kilgore, of course, takes the position that the newspaper reports are substantially misleading in that they wrongfully imply that he was, and is, "engaged in criminal conspiracies involving murder, unlawful motorcycle gangs, prison gangs, terrorists, organized gambling, loan sharking, security thefts, investment frauds, pornography, prostitution and drug trafficking." He maintains that this is neither fair nor true, because while the committee's report may have characterized him as an organized crime figure, it did not suggest that he was now, or indeed had ever been involved in organized underworld activity in the manner and to the extent set forth above.

The media respond by asserting that the protection of the privilege is earned by any report which captures the substance, the "gist" or "sting" of the subject proceedings or documents. (See *Hayward* v. *Watsonville Register-Pajaronian and Sun* (1968) 265 Cal.App.2d 255 [71 Cal.Rptr. 295].) Both papers, of course, urge us to uphold the trial court's conclusion that in fact the substance of their reports remained true to Younger's statements and the materials released by him.

■ In assessing this question, "the publication[s] [are] to be measured by the natural and probable effect [they] would have on the mind of the average reader. [Citations.] The standard of interpretation to be used in testing alleged defamatory language is how those in the community where the matter[s] [were] published would reasonably understand [them]. [Citation.]" (*Handelsman* v. *San Francisco Chronicle* (1970) 11 Cal.App.3d 381, 387 [90 Cal.Rptr. 188] [brackets in Court of Appeal opinion].)

■ Kilgore's attempt to read the reports' delineation of organized criminal activity as pertaining in all respects to himself is unwarranted. In our view, the average reader of either paper would reasonably interpret the articles to imply only that Kilgore was connected in some fashion with organized crime. As we see it, this is exactly the import of Attorney General Younger's release. In other words, we simply do not believe that the average reader would take the articles to intimate that Kilgore was involved in every—or even necessarily more than one—type of organized criminal activity. We hold, therefore, that the papers captured the substance of Attorney [General] Younger's release, and thus that the requirement of section 47, subdivision 5, to wit: that the reports be fair and true, was satisfied as a matter of law. The trial court properly so found. [ ]

As far as the second cause of action for the intentional infliction of emotional distress is concerned, the reasoning which makes such a cause of action subject to the absolute privilege of subdivision 2 of section 47 of the Civil Code, applies with equal force to the privileges contained in subdivision 5 of the same section. (See *Lerette* v. *Dean Witter Organization, Inc.* (1976) 60 Cal.App.3d 573, 579 [131 Cal.Rptr. 592].)

■ On the other hand, Kilgore's third cause of action, for invasion of privacy, is not grounded on the alleged inaccuracy of the papers' reportage. Rather, it is predicated on the charge "that even if accurate

the publication of the facts interferes with his 'right to be left alone.' [Citation.]" (*Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, 35 [81 Cal.Rptr. 360, 459 P.2d 912].) With regard to the media, however, Kilgore enjoyed no such rights: By virtue of the release of the report and appendix A thereto, Kilgore's name and alleged criminal involvement became matters of public record. Manifestly, the publication of such "newsworthy" information may not be circumscribed, at least where, as here, the articles carefully noted the "alleged" nature of the report and Kilgore's underworld involvement. (See *Cox Broadcasting Corp.* v. *Cohn* (1975) 420 U.S. 469 [43 L.Ed.2d 328, 955 S.Ct. 1029]; see also Rest.2d Torts, § 652D, com. b: "There is no liability [for invasion of privacy] when the defendant merely gives further publicity to information about the plaintiff that is already public.") On this record, the trial court did not err as to the media demurrers.

YOUNGER'S DEMURRER

■ Subdivision 1 of section 47 of the Civil Code provides that a privileged publication is one made "[i]n the proper discharge of an official duty." When that privilege applies, it is not qualified but absolute. (*Saroyan* v. *Burkett* (1962) 57 Cal.2d 706, 710 [21 Cal.Rptr. 557, 371 P.2d 293]; see also *Sanborn* v. *Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 412-413 [134 Cal.Rptr. 402, 556 P.2d 764]; Rest., Torts, § 591.) The absolute privilege is extended to "high-ranking state and federal officials, such as the President of the United States, the governor of any state or territory, cabinet officers of the United States and the corresponding officers of any state or territory" (*Sanborn* v. *Chronicle Pub. Co., supra*, 18 Cal.3d, at p. 412) on the rationale that their ability to function would be impaired and society adversely affected if they were not absolutely free of the threat of suit by the defamed seeking recompense for injury. (See Rest.2d Torts, ch. 25, [topic 2,] tit. B [, p. 243]; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 294.) Unlike qualified privileges, it is not negated by malice or other personal motivation of the publisher. [] [(See Rest.2d Torts, ch. 25, topic 3, tit. A, p. 258; 4 Witkin, *supra*, § 306.) Further, the privilege is equally applicable to defamation and other actions, excepting only those for malicious prosecution. (*Pettitt* v. *Levy* (1972) 28 Cal.App.3d 484, 489 [104 Cal.Rptr. 650].)] For the absolute privilege to attach, the public official need only be properly discharging an official duty.

■ [¶] However, Kilgore contends that Younger was not entitled to the absolute privilege because:

(1) Appendix "A" of the report released to the press by Younger contained criminal [offender] record information within the meaning of Penal Code section 11075 and state summary criminal history information within the purview of Penal Code section 11105—and the dissemination of that information to the public was unlawful and therefor[e] not a "proper" discharge of Younger's official duty, and

(2) The dissemination of the information to the news media was politically motivated, i.e., Younger was acting as a candidate and therefor[e] not performing an "official duty." []

The latter argument is without merit: Younger's alleged activity, though it may well have been taken to produce a popular and appealing law enforcement image, was for all intents and purposes indistinguishable from actions initiated by public officials truly oblivious to the political ramifications of their moves. [] Here, Younger called his press conference in his capacity as Attorney General, purported to act in such role throughout its duration and, at least as is here relevant, dealt exclusively with law enforcement issues. As such, it may not be said that his actions were outside the scope of his official duties, or that his motives were in fact improper. []

Having found Younger to be discharging an "official duty" at the press conference, we must now address Kilgore's other contention as to the "propriety" of that discharge. []

It is Kilgore's contention that Younger's duty to report under the Government Code was eclipsed by his duty to remain silent under the Penal Code. Under Penal Code section 11077, Younger was responsible for the security of criminal offender record information. It was his duty to see that only authorized agencies received such information and only when it was ". . . demonstrably required . . ." for performance of official duties. [] [(Pen. Code., § 11077, subd. (b).)]

Similarly, Kilgore points out that under Penal Code section 11105, subdivision (b), state summary criminal history information (i.e., the master record compiled by the Attorney General) may be generally furnished by the Attorney General to only [] [fourteen] described and authorized recipients, and that there are only eight other described recipients who may be furnished such information upon a showing of a "compelling need." (Pen. Code, § 11105, subd. [](c).) []

Kilgore also notes that Penal Code sections 11141 and 11142 complete the legislative scheme by providing criminal penalties for persons who knowingly furnish a record or information from a record to someone who is not authorized by law to receive it.

The basic problem with Kilgore's arguments, however, is that [ ] they "assume allegations not in the complaint." They are, rather, based on a super-benign reading of paragraph IX of the first cause of action, [ ] [which reads: "Pursuant to such purported authorization from defendant EVELLE J. YOUNGER, the said Organized Crime Control Commission conducted a series of private, 'closed-door' hearings and conferences, not open to the public, to gather information, on a confidential basis, from various law enforcement officials, representatives of various governmental regulatory agencies and confidential informants. During the course of such hearings and conferences the said Commission gathered, received and reviewed 'criminal record information,' within the meaning of California Penal Code § 11075, and 'state summary criminal history information,' within the meaning of California Penal Code § 11105, and ascertained the identities of 292 persons whom it suspected of being linked to organized crime activities in California."]

[¶] By no stretch of the imagination can this paragraph be read to allege "directly and positively" (*People* v. *Jones* (1899) 123 Cal. 299, 301 [55 P. 992]) [ ] that any of the statements concerning Kilgore were revelations of material which the Penal Code enjoins the Attorney General to keep confidential. As far as the pleading is concerned, the "criminal record information" and the "state summary criminal history information" were simply the source of the identities of 292 persons suspected of being linked to organized crime. There is no [ ] suggestion that the particular statements concerning Kilgore derived from this allegedly confidential information, rather than from information gathered "from various law enforcement officials, representatives of various governmental regulatory agencies and confidential informants." In fact, the very opposite should be the truth: the sting—at least of the defamation—can hardly be the trivial differences between the convictions which Kilgore admittedly suffered [—in 1962 for bookmaking (Pen. Code, § 337a), in 1975 for transmitting betting odds (*id.*, § 337i), and in 1971 for disseminating and conspiring to disseminate gambling information in interstate commerce (18 U.S.C. § 1952), for which he served a 14-month sentence—] and Younger's statements concerning his criminal record, but must, rather, consist of the report's description of

Kilgore as an "organized" criminal. [ ] A careful reading of the definitions contained in sections 11075 and 11105 of the Penal Code makes it extremely unlikely [ ] that information that Kilgore is involved in "organized" crime would be deemed confidential. In fact, under section 11105, subdivision (a)(2)(ii), "records of intelligence information . . . of the office of the Attorney General and the Department of Justice" are specifically excepted from the definition of "state summary criminal history information."

The only tenable contention that Younger's publication was not a "proper" discharge of his official duty lies in his alleged illegal dissemination of information made confidential by sections 11075 and 11105 of the Penal Code. As we have shown, no such illegal dissemination is properly alleged. The complaint therefor[e] does not state a cause of action. [End of relevant portion of Court of Appeal opinion.]

Nor can we agree with plaintiff's contention that the trial court abused its discretion in sustaining defendant Younger's demurrer without giving plaintiff an opportunity to amend his complaint. "Leave to amend should be denied where the facts are not in dispute, and the nature of the plaintiff's claim is clear, but, under the substantive law, no liability exists." (3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 847, p. 2451; *Berkeley Police Assn.* v. *City of Berkeley* (1977) 76 Cal.App.3d 931, 942-943 [143 Cal.Rptr. 255]; *Robertson* v. *City of Long Beach* (1937) 19 Cal.App.2d 676, 679 [66 P.2d 167].)

No California case has been brought to our attention which denies to a high-ranking state official, such as the Attorney General, immunity from civil liability for publications made in the course of his policy making functions, whether or not they are claimed to be made in violation of other statutory provisions. Instead, the disciplining of such public officials who act illegally traditionally has been left to criminal prosecution or impeachment, when appropriate, in order to free those officials "to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties which would consume time and energies which would otherwise be devoted to governmental service. . ." (*Barr* v. *Matteo* (1958) 360 U.S. 564, 571 [3 L.Ed.2d 1434, 1441, 78 S.Ct. 204]; accord, *Gregoire* v. *Biddle* (2d Cir. 1949) 177 F.2d 579, 581; see Prosser, Law of Torts (4th ed. 1971) § 132, p. 989; 1 Harper & James, Law of Torts (1956) § 5.23, p. 429.)

Notably, all three branches of government have been afforded the privilege in their "proceedings." (Civ. Code, § 47.) As expressed in *Hancock* v. *Burns* (1958) 158 Cal.App.2d 785, 792 [323 P.2d 456], the rationale underlying the *legislative* absolute privilege is equally applicable to *executive* privilege: "If government, operating through the individuals who form it, is afforded immunity from private suit only when its actions are beyond any question, and loses that immunity upon mere allegation of improper motives or unlawful acts in a complaint seeking damages, then those persons who form government are subject to the threat of personal liability in any matter in which their discretion is exercised."

■ Stated another way, the purpose of the official immunity accorded government officers is to avoid the "chilling effect" which the fear of damage suits would have on the energetic performance of the public's business. (See *Barr* v. *Mateo, supra,* 360 U.S. 564, 571 [3 L.Ed.2d 1434, 1441, 78 S.Ct. 204].) In the instant case, the potential for such a chilling effect is substantial. Mere allegation that the publication contained confidential information would avoid a demurrer. At a minimum, trials would be required to determine factually whether the genesis of the information was a statutorily protected file or some other unprotected source. Presumably, other charges of improper disclosure, no matter how trivial, would also demand factual hearings to delineate the scope of "propriety" in each case. At that point, of course, the damage to the proper functioning of government has already occurred since the threat of litigation will discourage public officials from providing for the extensive and robust dissemination of information so necessary in a democratic society.

■ It may be that the Legislature will determine at some point in the future that certain types of information are so deserving of confidentiality as to warrant compensation from government officials if the information is improperly disclosed. If so, such legislation would best focus on the nature of the information disclosed rather than the file from which it came, thus avoiding time-consuming and confusing litigation as to source. Pending such a legislative determination, however, the policies underlying the official immunity contained in Civil Code section 47, subdivision 1, require its application here. Having been made within the proper scope of the Attorney General's authority, that is, in the "proper discharge of an official duty," the challenged publication is absolutely privileged.

Having determined that there is no reasonable probability or reasonable possibility that plaintiff can amend his complaint to state a cause of action under the applicable substantive law interpreting that statute, we find no abuse of discretion in the trial court's sustaining of defendant Younger's general demurrer without leave to amend. (See *Vater* v. *County of Glenn* (1958) 49 Cal.2d 815, 821 [323 P.2d 85] ["possibility"]; *Sackett* v. *Wyatt* (1973) 32 Cal.App.3d 592, 603 [108 Cal.Rptr. 219] ["probability"].)

The judgment is affirmed.

Mosk, J., Newman, J., and Wiener, J.,* concurred.

**BIRD, C. J.,** Concurring and Dissenting.—I write separately because I cannot agree that the Attorney General, with his extensive powers over the enforcement of all state laws, has an absolute privilege to publish defamatory statements in violation of the state Constitution or statutory law. However, newspapers, which reprint this defamatory material released to them by the Attorney General, should not be liable for the republication.

### I.

The California Constitution vests the office of the Attorney General with enormous powers over the lives of the citizens of this state. "Subject to the powers and duties of the Governor, the Attorney General shall be the chief law officer of the State. It shall be the duty of the Attorney General to see that the laws of the State are uniformly and adequately enforced. The Attorney General shall have direct supervision over every district attorney and sheriff and over such other law enforcement officers as may be designated by law, in all matters pertaining to the duties of their respective offices, and may require any of said officers to make reports concerning the investigation, detection, prosecution, and punishment of crime in their respective jurisdictions as to the Attorney General may seem advisable. Whenever in the opinion of the Attorney General any law of the State is not being adequately enforced in any county, it shall be the duty of the Attorney General to prosecute any violations of law of which the superior court shall have jurisdiction, and in such cases the Attorney General shall have all the powers of a district attorney. When required by the public interest or

---

*Assigned by the Chairperson of the Judicial Council.

directed by the Governor, the Attorney General shall assist any district attorney in the discharge of the duties of that office." (Cal. Const., art. V, § 13.)

In addition to being "chief law officer" of the state, and head of the Department of Justice (Gov. Code, § 12510), the Attorney General is the state's chief attorney. As the state's lawyer, the Attorney General counsels and represents the state's governmental departments (Gov. Code, §§ 11157, 12511, 12512) as well as numerous commissions and boards. (See, e.g., Gov. Code, § 66748; Food & Agr. Code, §§ 4352, 4357; Bus. & Prof. Code, §§ 2116, 10079; Pub. Resources Code, §§ 25221, 26010.)[1] Also, the Attorney General has the power to issue written opinions on legal problems which relate to any governmental office upon the request of the Governor, the Legislature, any state agency prohibited from hiring independent legal counsel or a district attorney. (Gov. Code, § 12519.) The published opinions of the Attorney General are compiled and often cited in court as secondary authority for a given proposition.

The Attorney General has the duty to enforce a wide range of state statutes which require expertise in a variety of legal specialities. (See, e.g., Gov. Code, § 12526, Bus. & Prof. Code, §§ 16750, 17204 [antitrust]; Gov. Code, §§ 12600, 12606, 12607, Pub. Resources Code, § 4603, Code Civ. Proc., § 389.6 [environmental law]; Bus. & Prof. Code, §§ 320, 321, 326, 17508, Ins. Code, § 790.06 [consumer law]; Gov. Code, § 12580 et seq. [charitable trusts]; Lab. Code, §§ 1312, 1399 [labor]; Civ. Code, § 52 [discrimination].)

In the area of criminal law, the Attorney General supervises all district attorneys and sheriffs. (Cal. Const., art. V, § 13; Gov. Code, §§ 12550, 12560.) These supervisory duties include the training and education of district attorneys and police personnel in the proper exercise of their duties and the limits of their authority. (See, e.g., Gov. Code, § 12524; Pen. Code, § 11077, subd. (d); Health & Saf. Code, § 11600.) The Attorney General also has special responsibilities in relation to the Youth Authority (Welf. & Inst. Code, § 1766.5), commitments of and establishments for the mentally ill (id., §§ 4021, 6316.2), the Bureau of Narcotic Enforcement (Health & Saf. Code,

---

[1]The Attorney General is also a member of numerous boards and commissions. (See, e.g., Gov. Code, § 8575 [Cal. Emergency Council]; Health & Saf. Code, § 11861 [Advisory Council on Drug Abuse].)

§§ 11450-11454, 11600) and the collection and dissemination of records of criminal investigations, arrests and convictions (Pen. Code, §§ 11101-11102, 11103-11105, 11075-11079, 13020-13022; Gov. Code, §§ 15150-15167).

The Attorney General has been given the power to compile and disseminate certain data about individual citizens. This broad grant of power is coupled with the authority to investigate any crime as the chief law officer of the state. (Gov. Code, § 12550.) The Attorney General has authority to inspect all books and records of people and businesses under investigation by a state agency. (Gov. Code, §§ 11180.5, 11181.) Such investigation may include use of special agents whose identities are known only to the Attorney General. (*Id.*, §§ 12570-12574.) An investigation may include enlisting the aid of any governmental agency, bureau or department. (*Id.*, §§ 11180.5, 11181.)

An investigation of any governmental official or agency by the Bureau of Criminal Identification and Investigation may not take place without the prior approval of the Attorney General. (Pen. Code, § 11054.) Some state employees may even be prosecuted for refusing to permit the Attorney General to inspect their records. (See Pen. Code, § 440.) Thus, the person who fills the office of Attorney General has enormous powers to direct how, when, and to what extent an investigation may take place. This power is coupled with an ability to obtain complete access to all governmental information about the individual being investigated.

The Attorney General is specifically authorized to set up and maintain a statewide telecommunications system for law enforcement purposes (Gov. Code, §§ 15151-15160). He also compiles criminal offender record information[2] and keeps summary criminal history information on residents of this state.[3] The Attorney General is specifi-

---

[2]Penal Code section 11075 states: "(a) As used in this article, 'criminal offender record information' means records and data compiled by criminal justice agencies for purposes of identifying criminal offenders and of maintaining as to each such offender a summary of arrests, pretrial proceedings, the nature and disposition of criminal charges, sentencing, incarceration, rehabilitation, and release.

"(b) Such information shall be restricted to that which is recorded as the result of an arrest, detention, or other initiation of criminal proceedings or of any consequent proceedings related thereto."

[3]Penal Code section 11105, subdivision (a) states: "(a)(1) The Department of Justice shall maintain state summary criminal history information.

"(2) As used in this section:

cally charged with the responsibility of ensuring the security of such data and preventing its unlawful dissemination. (Pen. Code, §§ 11077, 11105, subds. (b), (c), (f) and (g).)[4] It was the alleged violation of this

"(i) 'State summary criminal history information' means the master record of information compiled by the Attorney General pertaining to the identification and criminal history of any person, such as name, date of birth, physical description, date of arrests, arresting agencies and booking numbers, charges, dispositions and similar data about such person.

"(ii) 'State summary criminal history information' does not refer to records and data compiled by criminal justice agencies other than the Attorney General, nor does it refer to records of complaints to or investigations conducted by, or records of intelligence information or security procedures of, the office of the Attorney General and the Department of Justice."

[4]Penal Code section 11077 states: "The Attorney General is responsible for the security of criminal offender record information. To this end, he shall: [¶] (a) Establish regulations to assure the security of criminal offender record information from unauthorized disclosures at all levels of operation in this state. [¶] (b) Establish regulations to assure that such information shall be disseminated only in situations in which it is demonstrably required for the performance of an agency's or official's functions...."

Penal Code section 11105 states in relevant part: "(b) The Attorney General shall furnish state summary criminal history information to any of the following, when needed in the course of their duties, ....

"(1) The courts of the state.

"(2) Peace officers of the state ....

"(3) District attorneys of the state.

"(4) Prosecuting city attorneys of any city within the state.

"(5) Probation officers of the state.

"(6) Parole officers of the state.

"(7) A public defender or attorney of record when representing a person in proceedings upon a petition for a certificate of rehabilitation and pardon pursuant to Section 4852.08 of the Penal Code.

"(8) A public defender or attorney of record when representing a person in a criminal case and when authorized access by statutory or decisional law.

"(9) Any agency, officer, or official of the state when such criminal history information is required to implement a statute or regulation that expressly refers to specific criminal conduct applicable to the subject person of the state summary criminal history information, and contains requirements or exclusions, or both, expressly based upon such specified criminal conduct.

"(10) Any city or county, or city and county, or district, or any officer, or official thereof ... [under specified conditions].

"(11) The subject of the state summary criminal history information under procedures established under Article 5 (commencing with Section 11120), Chapter 1, Title 1 of Part 4 of the Penal Code.

"(12) Any person or entity when access is expressly authorized by statute when such criminal history information is required to implement a statute or regulation that expressly refers to specific criminal conduct applicable to the subject person of the state summary criminal history information, and contains requirements or exclusions, or both, expressly based upon such specified criminal conduct.

"(13) Health officers of a city, county, or city and county, or district, when in the performance of their official duties enforcing Section 3110 of the Health and Safety Code.

"(14) Any managing or supervising correctional officer of a county jail or other county correctional facility.

statutory duty which constituted an improper discharge of an official duty, and, therefore, an unprivileged defamation, according to the plaintiff.[5]

Having enumerated some of the unique powers and duties of the office of Attorney General, the court must decide if the chief law officer of this state may assert an absolute privilege to defame even if he violates the very statutes and Constitution he is charged with enforcing.

---

"(c) The Attorney General may furnish state summary criminal history information upon a showing of a compelling need to any of the following, ...

"(1) Any public utility as defined in Section 216 of the Public Utilities Code which operates a nuclear energy facility when access is needed in order to assist in employing persons to work at such facility, provided that, if the Attorney General supplies such data, he shall furnish a copy of such data to the person to whom the data relates.

"(2) To a peace officer of the state other than those included in subdivision (b).

"(3) To a peace officer of another country.

"(4) To public officers (other than peace officers) of the United States, other states, or possessions or territories of the United States, provided that access to records similar to state summary criminal history information is expressly authorized by a statute of the United States, other states, or possessions or territories of the United States when such information is needed for the performance of their official duties.

"(5) To any person when disclosure is requested by a probation, parole, or peace officer with the consent of the subject of the state summary criminal history information and for purposes of furthering the rehabilitation of the subject.

"(6) The courts of the United States, other states or territories or possessions of the United States.

"(7) Peace officers of the United States, other states, or territories or possessions of the United States.

"(8) To any individual who is the subject of the record requested when needed in conjunction with an application to enter the United States or any foreign nation.

". . . . . . . . . . . . .

"(f) Whenever there is a conflict, the processing of criminal fingerprints and fingerprints of applicants for security guard or alarm agent registrations or firearms qualification permits submitted pursuant to Section 7514 of the Business and Professions Code shall take priority over the processing of applicant fingerprints.

"(g) It is not a violation of this section to disseminate statistical or research information obtained from a record, provided that the identity of the subject of the record is not disclosed.

"(h) It is not a violation of this section to include information obtained from a record in (1) a transcript or record of a judicial or administrative proceeding or (2) any other public record when the inclusion of the information in the public record is authorized by a court, statute or decisional law."

[5]The plaintiff also alleged an invasion of privacy. He did not specify whether it was his common law or constitutional right which was abridged. However, *Central Valley Chap. 7th Step Foundation v. Younger* (1979) 95 Cal.App.3d 212 [157 Cal.Rptr. 117], hearing denied, September 20, 1979, held that an unlawful dissemination of an arrest record under Penal Code section 11105 stated a prima facie case of a violation of the state constitutional right of privacy. Throughout this opinion, statutory and constitutional violations are discussed together.

In California, Civil Code section 47, subdivision 1, provides a governmental privilege. "A privileged publication or broadcast is one made—1. In the proper discharge of an official duty." This privilege protects high-ranking, policy-making executives in state government. (*Sanborn* v. *Chronicle Pub. Co.* (1976) 18 Cal.3d 408, 412 [134 Cal.Rptr. 402, 556 P.2d 764].) When it applies, the privilege is absolute and cannot be defeated by a showing of malice. (*Saroyan* v. *Burkett* (1962) 57 Cal.2d 706 [21 Cal.Rptr. 557, 371 P.2d 293].)

Executive officials are privileged if the defamatory statement or material they publish bears "'some relation to the executive proceeding in which the officer is acting.'" (*Id.*, at p. 710, quoting Rest., Torts, § 591.) This privilege applies equally to claims of defamation and other causes of action. (*Pettitt* v. *Levy* (1972) 28 Cal.App.3d 484, 489 [104 Cal.Rptr. 650] and cases cited therein.) However, it does not affect cases involving malicious prosecution. (*Ibid.*)

In the present case, the Attorney General demurred to the complaint and claimed he had an absolute privilege to defame based on his official duty privilege. He claims that he was obliged to report on his activities in the area of organized crime control. (Gov. Code, § 15028.) Therefore, he argues, his release of the OCCC report was merely a "discharge of an official duty."[6]

Plaintiff contends that the Attorney General lost the protection of the privilege by *improperly* discharging his duty and unlawfully publishing defamatory material about him. The Attorney General's free access to confidential and potentially damaging materials and his special duty to keep it secure make plaintiff's charge especially serious. Plaintiff contends that the Attorney General may not *unlawfully* divulge private data and then use the shield of his privilege since the privilege is available only when he is acting in the "proper" discharge of his duties.

The Attorney General relies primarily on *Saroyan* v. *Burkett, supra,* 57 Cal.2d 706. He claims that the official duty privilege is absolute and even a showing of unlawfulness will not deprive him of his statutory immunity. However, this position ignores the clear language of the statute which requires a "proper discharge" of duties before a person can invoke its protection.

---

[6]The plaintiff also claims that defendant Younger was not fulfilling an official duty because he was a candidate in the gubernatorial election campaign.

The Attorney General's reliance on *Saroyan* is misplaced. That case merely concluded that if and when the privilege attaches, it is absolute and cannot be defeated by a claim of malice. This is the traditional distinction between absolute and qualified privileges. (See Prosser, Handbook of the Law of Torts (4th ed. 1971) pp. 776-777.) *Saroyan* did not raise or resolve the issue of an illegal publication by an official. (Cf. *Butz* v. *Economu* (1977) 438 U.S. 478, 487-489 [57 L.Ed.2d 895, 903-905, 98 S.Ct. 2894].)[7]

The weight of authority suggests that an absolute privilege is not always accorded a governmental official. For example, if an official goes outside the grant of authority, such acts are not absolutely privileged. (See, e.g., *Spalding* v. *Vilas* (1896) 161 U.S. 483, 498 [40 L.Ed. 780, 786, 16 S.Ct. 631] ["head of an Executive Department, keeping within the limits of his authority" is absolutely privileged]; *Cheatum* v. *Wehle* (1959) 5 N.Y.2d 585 [186 N.Y.S.2d 606, 159 N.E.2d 166]; Rest.2d Torts, § 591, com. f.) Also, if an official is fulfilling only a ministerial and not a policy-making function, he is not absolutely privileged. (*Sanborn* v. *Chronicle Pub. Co., supra*, 18 Cal.3d at p. 413; *H & M Associates* v. *City of El Centro* (1980) 109 Cal.App.3d 399, 408 [167 Cal.Rptr. 392].) These authorities illustrate that the bare assertion of an absolute privilege is not sufficient. Certain prerequisites must be shown before entitlement to such a privilege can be established.

Plaintiff contends that one such prerequisite is that the Attorney General's action must constitute a "proper," or lawful, discharge of his duties. (See Civ. Code, § 47, subd. 1.) To rule otherwise would mean

---

[7]*Pettitt* v. *Levy, supra*, is inapposite since it involved the application of a different privilege, not analogous to the privilege in this case. Section 47, subdivision 2 provides a separate privilege for defamatory publications made during the course of a legislative, judicial or other official proceeding authorized by law. This privilege is accorded to *all* statements made on the privileged occasion; it is not limited to "proper" statements.

This privilege may not be defeated by a showing that the publication was unlawful. (*Pettitt* v. *Levy, supra*, 28 Cal.App.3d at p. 488.) Since the language of the two privileges are not parallel, the interpretation of subdivision 2 is not helpful in illuminating the meaning of the term "proper" in subdivision 1. Also, the purposes served by the two privileges differ significantly. (Cf. *Butz* v. *Economu, supra*, 438 U.S. 478, 508-517 [57 L.Ed.2d 895, 916-923].) The rules governing the application of these privileges differ as a result.

Of course, the privilege in subdivision 2 requires certain prerequisites which must be met. It does not automatically apply to every case in which it is pleaded. (See *Bradley* v. *Hartford Acc. & Indem. Co.* (1973) 30 Cal.App.3d 818, 824 [106 Cal.Rptr. 718]. See also *Stump* v. *Sparkman* (1977) 435 U.S. 349 [55 L.Ed.2d 331, 98 S.Ct. 1099] [a judge is not privileged if he acts in the clear absence of all jurisdiction or outside his official capacity].)

that the term "proper" encompasses an unlawful act. The Attorney General's interpretation of the privilege reads the word "proper" out of the statute altogether since *any* act bearing on the duties of the office would be absolutely privileged regardless of its legality. Plaintiff's contention has merit. This court should not assume that the Legislature used the term "proper" accidentally or superfluously. (2A Sutherland, Statutes and Statutory Construction (Sands rev. 3d ed. 1973) § 46.06, p. 63 [each word should be given its proper effect].)

Thus, the issue is whether an unlawful publication of allegedly defamatory confidential material by the Attorney General, who is responsible for safeguarding its dissemination, can ever be considered a "proper discharge" of his official duties. It would strain the credulity of even a jaundiced observer of the governmental scene if this court were to rule that an unlawful or unconstitutional act by the Attorney General could, nonetheless, be considered a "proper" discharge of his official tasks.

An absolute privilege only applies if the public service or administration of justice requires complete immunity. (*Bradley* v. *Hartford Acc. & Indem. Co., supra,* 30 Cal.App.3d at p. 824; see also *Butz* v. *Economu, supra,* 438 U.S. at p. 507 [57 L.Ed.2d at p. 916].) The public has an overriding interest in the effective functioning of its government. However, it invests no discretion in its officials to violate the law. Moreover, the public has *no* interest in shielding high government officials from liability for unlawful or unconstitutional acts engaged in knowingly. On the contrary, when an executive officer engages in illegal activity, the cloak of his or her governmental office should not be used to immunize wrongdoing.

The Supreme Court articulated this important axiom in *United States* v. *Lee* (1882) 106 U.S. 196 [27 L.Ed.2d 171, 1 S.Ct. 240]. "No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All of the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it. [¶] It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives." (*Id.,* at p. 220 [27 L.Ed. at p. 182].)

The warnings of Chief Justice Groner of the District of Columbia Circuit Court of Appeals should not be ignored. He cautioned that the courts can "... unwittingly create[] a privilege so extensive as to be almost unlimited and altogether subversive of the fundamental principle that no man in this country is so high that he is above the law." (*Glass v. Ickes* (D.C. Cir. 1940) 117 F.2d 273, 282 (conc. opn. of Groner, C. J.).)

With the memories of gross abuses by the highest officers of our land still fresh, it is especially important that an illegal act not be approved by this court as an official duty encompassed within the mandate of public office.

The Attorney General's office is a particularly sensitive office since the holder of that position is the chief law enforcement officer of the state. As the attorney for the state, the Attorney General must take responsibility for his own violations of statutory or constitutional prohibitions. Impeachment is not a useful remedy for the state's citizenry because it is a cumbersome and unwieldy process which is never used. Also, it may be too great a sanction for every violation. Further, reliance on the criminal prosecution machinery to correct unlawful governmental acts by the Attorney General is inadequate at best. Since Penal Code section 11054 prohibits investigation of criminal acts by government officers without the authorization of the Attorney General, such reliance would be the equivalent of allowing the fox to guard the chicken coop.

The average citizen who commits an unlawful act may be held *both* criminally and civilly liable. Surely, the Attorney General claiming the protection of his office is no more authorized by that office to commit a crime or an unconstitutional act than is any other citizen of this state. Is it too much to expect that the Attorney General meticulously obey both the letter and the spirit of the law? I think not. The Attorney General is scarcely in a position to claim that he is authorized to violate any provision of the law. Since the Attorney General occupies a unique position, he should not be able through an unlawful act to cause injury to a citizen of this state with impunity. The public interest is not being served and the victim of his illegal act should be free to pursue his legal remedy for damages.

In *Butz* v. *Economu, supra,* the United States Supreme Court reached a similar conclusion. The *Butz* opinion rested on the impor-

tance of the public interest in protecting civil rights from incursions by government personnel. The court pointed out that a cause of action for a constitutional violation would be "drained of meaning" if officials were accorded absolute immunity for their constitutional transgressions. (*Id.*, at p. 501 [57 L.Ed.2d at p. 913].)

"If, as the Government argues, all officials exercising discretion were exempt from personal liability, a suit under the Constitution could provide no redress to the injured citizen, nor would it in any degree deter federal officials from committing constitutional wrongs.... [¶] The extension of absolute immunity from damages liability to all federal executive officials would seriously erode the protection provided by basic constitutional guarantees." (*Id.*, at p. 505 [57 L.Ed.2d at p. 915].)

Based on public policy considerations, the court concluded that qualified immunity would be sufficient to protect officials invested with discretionary powers.[8] "... [C]ases have recognized that it is not unfair to hold liable the official who knows or should know he is acting outside the law, and that insisting on an awareness of clearly established constitutional limits will not unduly interfere with the exercise of official judgment.... [¶] ... Federal officials will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law. But we see no substantial basis for holding, as the United States would have us do, that executive officers generally may with impunity discharge their duties in a way that is known to them to violate the United States Constitution or in a manner that they should know transgresses a clearly established constitutional rule." (*Id.*, at pp. 506-507 [57 L.Ed.2d at p. 916].)

In the present case, the issue before the court involves the privilege as it applies to the chief law enforcement officer in the state. The Attorney General is not authorized as part of his official duties to violate constitutional mandates or statutory proscriptions. The nondisclosure statutes which are the basis of plaintiff's gravamen and which he alleges were violated in this case specifically prohibit the wholesale dissemination of criminal records.[9] They protect the individual's constitutional right of privacy.

---

[8]Since Attorney General Younger raised no other claims of privilege on demurrer, it is not necessary at this time to determine whether other privileges might apply in this case.

[9]See Penal Code sections 11075-11081, 11105, 11140-11144; *ante*, at pages 785-787, footnotes 2, 3 and 4. As this court noted in *Loder* v. *Municipal Court* (1976) 17 Cal.3d

As this court acknowledged in *White v. Davis* (1975) 13 Cal.3d 757, 775 [120 Cal.Rptr. 94, 533 P.2d 222], the right of privacy amendment to the state Constitution was addressed, in part, to the unlawful dissemination and misuse of an individual's governmental records. Therefore, the violation of these statutes has constitutional dimensions. When the Attorney General violates a statute by publishing confidential material, he cannot be said to have properly discharged his duties. Since Civil Code section 47, subdivision 1 relates to privileged publications, it is the *unlawful* publication which is not privileged.

Here, if the Attorney General knew or should have known that the publication of confidential material violated clear constitutional or statutory law when he published it, then he could not be said to be "properly discharging his official duties." (Cf. *Wood v. Strickland* (1975) 420 U.S. 308, 322 [43 L.Ed.2d 214, 225, 95 S.Ct. 992].) He has no absolute privilege to do so under Civil Code section 47, subdivision 1.

If unlawful acts committed by the Attorney General are not "proper" within the meaning of Civil Code section 47, subdivision 1, does the plaintiff's complaint sufficiently state a cause of action outside the scope of the official duty privilege? The law is clear. Properly pleaded factual allegations are deemed admitted by the defendant's demurrer for purposes of appeal. (*White v. Davis, supra*, 13 Cal.3d at p. 765.) Here, the complaint alleged that the Attorney General "unlawfully distributed, published and circulated" the OCCC report and appendix to the press for republication. It also alleged that the OCCC "gathered, received and reviewed 'criminal record information,' within the meaning of California Penal Code § 11075, and 'state summary criminal history information' within the meaning of California Penal Code § 11105 . . . ."

Plaintiff contended that the Attorney General invaded his right of privacy by disseminating criminal records about him which the Attorney General was duty-bound under these statutes to keep confidential. These assertions were alluded to in the complaint but were not specifically alleged. As a result, the complaint is defective as to substance. However, the defect may be cured by the inclusion of the missing alle-

---

859, 872-874 [132 Cal.Rptr. 464, 553 P.2d 624], these statutes were intended to control improper dissemination of criminal records. Also, they make criminal any unlawful disclosures. (See Pen. Code, §§ 11141-11143.)

gations. Therefore, leave to amend should not have been denied by the trial court. (3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 845, p. 2450, and cases cited therein.)

Since there is a possibility that plaintiff can plead a proper legal claim, the cause should be returned to the trial court. It is *conceivable* that plaintiff can allege a knowing violation of his constitutional right of privacy (Cal. Const., art. I, § 1) by virtue of the Attorney General's release of his criminal records to the public.[10] Also, there are other plausible contentions that need not be hypothesized.[11] Since it is possible to allege an unprivileged defamation and/or an improper invasion of privacy, plaintiff must be given the opportunity to amend his complaint. Therefore, the trial court should have granted plaintiff leave to amend his complaint as to the Attorney General.

## II.

The trial court was correct in granting a general demurrer without leave to amend as it applies to the media defendants. Since the opinion of the Court of Appeal by Judge Florence Bernstein properly resolved this issue, that portion of her opinion is set out in pertinent part.[12]

"[][T]he media—that is all defendants except Younger—premised their demurrers on the privilege afforded by subdivisions 4 and 5 of section 47 of the Civil Code: "A privileged publication or broadcast is one made— ... 4. By a fair and true report in a public journal, of (1) a judicial, (2) legislative, or (3) other public official proceeding, or (4) of anything said in the course thereof ... 5. By a fair and true report of (1) the proceedings of a public meeting, if such meeting was lawfully convened for a lawful purpose and open to the public, or (2) the publication of the matter complained of was for the public benefit.'"

---

[10]The right of privacy was placed in the state Constitution by the voters in 1972. It is self-executing and creates an enforceable privacy right for each citizen. (*White* v. *Davis, supra*, 13 Cal.3d at p. 775.) Such a right of action for a violation of the right of privacy has been alleged based on the unlawful dissemination of records prohibited by Penal Code section 11105. (*Central Valley Chap. 7th Step Foundation* v. *Younger, supra*, 95 Cal.App.3d at p. 240.)

[11]Amici American Civil Liberties Union et al., argue that plaintiff was denied due process of law by the release of the OCCC report. Since this issue was neither pleaded nor argued below, it is not addressed here.

[12]Brackets together, in this manner [], without enclosing material, are used to indicate deletions from the opinion of the Court of Appeal.

A parallel privilege contained in the Restatement Second of Torts reads in relevant part as follows: "The publication of defamatory matter concerning another in a report of . . . a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported." (*Id.*, § 611.)

Clearly, section 47, subdivision 5 provides an adequate basis on which to uphold the trial court's ruling. It cannot be gainsaid that as far as the press was concerned, the news conference was a legally convened public meeting for a lawful purpose to which the public—by way of the media—had been invited.[3]

Somewhat more troublesome, however, is the accompanying requirement of [subdivision] 5 that the media articles be "fair and true" reports. [Plaintiff] takes the position that the newspaper reports are substantially misleading in that they wrongfully imply that he was, and is, "engaged in criminal conspiracies involving murder, unlawful motorcycle gangs, prison gangs, terrorists, organized gambling, loan sharking, security thefts, investment frauds, pornography, prostitution and drug trafficking." He maintains that this is neither fair nor true, because [] the committee's report may have characterized him as an organized crime figure, [but] it did not suggest that he was now, or indeed had ever been involved in organized underworld activity in the manner and to the extent set forth above.

The media respond by asserting that the protection of the privilege is earned by any report which captures the substance, the "gist" or "sting" of the subject proceedings or documents. (See *Hayward* v. *Watsonville Register-Pajaronian and Sun* (1968) 265 Cal.App.2d 255 [71 Cal.Rptr. 295].) Both papers, of course, urge [that] the trial court's conclusion [be upheld] that in fact the substance of their reports remained true to [the Attorney General's] statements and the materials released by him.

In assessing this question, "the publication[s] [are] to be measured by the natural and probable effect [they] would have on the mind of the average reader. [Citations.] The standard of interpretation to be used in

---

[3]While we do not doubt that the publication [here] was intended for the public benefit, this analysis makes it unnecessary to solve the troublesome question [as to] where the alternative provision of subdivision 5—"or (2) the publication of the matter complained of was for the public benefit[]"—fits in. (Cf., *Williams* v. *Daily Review, Inc.* (1965) 236 Cal.App.2d 405, 416 [46 Cal.Rptr. 135].)

testing alleged defamatory language is how those in the community where the matter[s] [were] published would reasonably understand [them]. [Citation.]" (*Handelsman* v. *San Francisco Chronicle* (1970) 11 Cal.App.3d 381, 387 [90 Cal.Rptr. 188].)

[Plaintiff's] attempt to read the reports' delineation of organized criminal activity as pertaining [in] all respects to himself is unwarranted. [T]he average reader of either paper would reasonably interpret the articles to imply only that [plaintiff] was connected in some fashion with organized crime. [T]his is exactly the import of [the] Attorney General['s] release. [] [T]herefore, [] the papers captured the substance of [the] Attorney General['s] release[.] [T]hus[,] [] the requirement of section 47, subdivision 5, to wit: that the reports be fair and true, was satisfied as a matter of law. The trial court properly so found.[4]

As far as the second cause of action for the intentional infliction of emotional distress is concerned, the reasoning which makes such a cause of action subject to the absolute privilege of subdivision 2 of section 47 of the Civil Code, applies with equal force to the privileges contained in subdivision 5 of the same section. (See *Lerette* v. *Dean Witter Organization, Inc.* (1976) 60 Cal.App.3d 573, at p. 579 [13 Cal.Rptr. 592].)

On the other hand, [plaintiff's] third cause of action, for invasion of privacy, is not grounded on the alleged inaccuracy of the papers' reportage. Rather, it is predicated on the charge "that even if accurate the publication of the facts interferes with his 'right to be left alone.' [Citation.]" (*Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, 35 [81 Cal.Rptr. 360, 459 P.2d 912].) With regard to the media, however, [plaintiff] enjoyed no such rights: [b]y virtue of the release of the report and appendix A thereto, [plaintiff's] name and alleged criminal involvement became matters of public record. Manifestly, the publication of such "newsworthy" information may not be circumscribed, at least where, as here, the articles carefully noted the "alleged" nature of the report and [plaintiff's alleged] underworld involvement. (See *Cox Broadcasting Corp.* v. *Cohn* (1975) 420 U.S. 469 [43 L.Ed.2d 328, 95 S.Ct. 1029]; see also Rest.2d Torts, § 652D, com. b: "There is no liability [for invasion of privacy] when the defendant merely gives further publicity to informa-

---

[4]The media also contend that their actions were privileged under both the United States and California Constitutions. [Since] section 47, subdivision 5 [is] applicable, [this contention is not reviewed].

tion about the plaintiff that is already public.") On this record, the trial court did not err as to the media demurrers."

### III.

The Attorney General has been entrusted by law with the power and duty to prosecute any violation of state law. He cannot claim an absolute privilege based on an official duty exemption where he is shown to have committed unlawful acts himself. The chief law enforcement officer of this state is not above the law. Since he is responsible for the uniform application of the laws, he cannot be held to be immune from suit when his actions are illegal. His office must set an example for the citizenry by scrupulously obeying all statutory and constitutional mandates.

When the occupant of that office knowingly violates the law, he *improperly* discharges his functions and loses the protection of his privilege. If the plaintiff can allege facts that show that the Attorney General knew or should have known that his publication violated statutory or constitutional provisions, the complaint states a cause of action that is not covered by the official duty privilege of Civil Code section 47, subdivision 1. The general demurrer granted by the trial court was properly sustained but plaintiff should have been granted leave to amend. The media defendants' general demurrer was properly sustained since plaintiff failed to state a claim that could withstand a challenge based on the media's broadcast and publication privilege.

I would reverse the judgment of dismissal and remand this case to the trial court with instructions to permit plaintiff leave to amend the complaint as it relates to the Attorney General's alleged unlawful acts. In all other respects, I would affirm the judgment.

Tobriner, J.,* and Tamura, J.,† concurred.

**TAMURA, J.,†** Concurring and Dissenting.—I am in full accord with the views expressed by the Chief Justice in her concurring and dissenting opinion.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.
†Assigned by the Chairperson of the Judicial Council.

The words "proper discharge of an official duty" in Civil Code section 47, subdivision 1, cannot mean "improper discharge of an official duty." The word "proper" pertains to the manner in which official duty is discharged. The statute cannot be read to extend the cloak of absolute immunity to an officer who performs his official duty in an illegal manner. The majority, however, so construes the statute by equating the phrase "proper discharge of an official duty" with the "proper scope of the [officer's] authority." The qualification of the phrase "scope of authority" by the adjective "proper" constitutes a redundancy; the word "proper" is rendered superfluous. Thus, as construed by the majority, inasmuch as the objective sought to be achieved by the Attorney General—the control and eradication of organized crime—was within the scope of his authority (Gov. Code, § 15025 et seq.), the statute confers absolute immunity for civil liability to one injured by the publication even if it had been made in knowing violation of an express statutory proscription or in knowing violation of the person's constitutional right. This borders on the notion that the end justifies the means, a governmental philosophy which is abhorrent in a free society such as ours.

Nor am I persuaded by the rationale that there will be a "chilling effect" on the energetic performance of official duty if public officials are not accorded unconditional immunity from civil liability for otherwise unlawful or unconstitutional acts. This theoretical basis for the rule of absolute official immunity has been properly criticized as presupposing that the specter of civil liability will deter a conscientious official from discharging his official duties in an energetic and responsible manner. (See Van Alstyne, *Governmental Tort Liability: A Public Policy Prospectus* (1963) 10 UCLA L.Rev. 463, 478-480.) During our recent national tragedy similar justifications were offered to excuse official excesses.

A rationale like the one advanced to support unconditional immunity of public officers from civil liability when acting in the scope of their duties has been advanced in defense of the doctrine of sovereign immunity from torts. It has been said that "public service would be hindered and the public safety endangered" if the doctrine of sovereign immunity were abolished. (*The Siren* v. *United States* (1869) 74 U.S. 152, 154 [19 L.Ed. 129, 130-131]; 3 Davis, Administrative Law Treatise (1958) § 25.01, pp. 438-439.) As Professor Davis points out experience has shown that abolition of the doctrine has neither hindered public service nor endangered public safety. Indeed, he notes that "the New York experience proves overwhelmingly that substituting sovereign

responsibility for sovereign irresponsibility can be wholly beneficial and in no respect harmful." (*Id.*, at p. 439.) This court abrogated the doctrine some 20 years ago in *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211 [11 Cal.Rptr. 89, 359 P.2d 457]. Justice Traynor, writing for the court, declared that "[t]he rule of governmental immunity for tort is an anachronism, without rational basis, and has existed only by the force of inertia." (*Id.*, at p. 216.)

The notion that public officials must be unconditionally shielded from civil liability for injury caused by even a knowing violation of a statutory proscription or a knowing violation of a citizen's constitutional right because otherwise the officials would be deterred from the energetic discharge of their duties is as groundless as the justification offered for the doctrine of sovereign immunity. The language of Civil Code section.47, subdivision 1, does not confer absolute immunity in such circumstances and should not be so construed.

Bird, C. J., and Tobriner, J.,* concurred.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.