[No. 31443-2-I.   Division One.   August 29, 1994.]

LIBERTY BANK OF SEATTLE, INC., *Plaintiff,* v. SIM HENDERSON, ET AL, *Defendants,* J. THOMAS WOOD, *Respondent,* THOMAS OLDFIELD, ET AL, *Appellants.*

*Christine O. Gregoire, Attorney General, Delbert W. Johnson, Senior Counsel, Michael E. Tardif, Senior Assistant,* and *Betty A. Edwards, Assistant,* for appellants.

*Jerry R. McNaul* and *Culp, Guterson & Grader,* for respondent.

BAKER, J. — Thomas Wood is the former president and CEO of the now defunct Liberty Bank. Defendants Thomas

Oldfield, supervisor of banking from 1985 to 1991, and William Rhodes, conservator for Liberty Bank, had regulatory authority over Liberty Bank. Wood claims that (1) Oldfield wrongfully interfered with his employment by pressuring the Liberty Bank board of directors to terminate him, and (2) Oldfield and Rhodes defamed him through statements made to the press, legislators, and bankers. A jury found in favor of Wood on both claims.

On appeal Oldfield contends that the trial court erred by denying his motion to dismiss Wood's wrongful interference claim. Specifically, Oldfield argues that the wrongful interference claim is collaterally estopped by the Ninth Circuit's finding in *FDIC v. Henderson*, 940 F.2d 465 (9th Cir. 1991) that his regulatory actions were reasonable under the circumstances. As to the defamation claim, Oldfield and Rhodes contend that the trial court erred in denying their motion for summary judgment because they were absolutely privileged to release the allegedly defamatory statements. Alternatively, they argue that even if the denial was proper, other instructional and evidentiary errors occurring at trial warrant dismissal or retrial. We reverse and remand in part for further proceedings.

# I

## FACTS[1]

Liberty Bank, chartered in 1968, was a single-branch, minority-owned bank located in a predominantly African-American and low income area in Seattle. In July 1984 the Federal Reserve Bank (FRB) conducted an examination of Liberty Bank and reported that the bank was in "fair" condition. In particular, the FRB found that the primary capital to total assets (loans) ratio was adequate but that the amount of classified assets had more than doubled since the previous examination.[2] The FRB recommended that Liberty Bank

---

[1]This statement of facts closely tracks the Ninth Circuit's summary provided in *FDIC v. Henderson, supra.*

[2]Loans are "classified" if they are in default, have repayment problems, or lack loan documentation indicating an ability to repay.

"concentrate on improving loan documentation and acquiring credit information for proper analysis".

In August 1984 Wood was appointed president and CEO of Liberty Bank. Wood determined that in order for the bank to become viable, it was necessary to recapitalize and to open a downtown Seattle branch. State law, however, required approval from the state supervisor of banking before either action could be pursued.[3] State Supervisor of Banking Malmberg (Oldfield's predecessor) withheld his approval of Wood's proposals.

In June 1985 the FRB conducted another examination of Liberty Bank. In its report, the FRB indicated that the bank's condition was unsatisfactory, with classified loans of $1,524,000, or 100 percent of the bank's capital funds. The FRB examiners concluded:

> The unsatisfactory condition of the bank is a direct result of inadequate leadership and supervision by the Board of Directors and senior management, both past and present. Management must redirect its priorities and take more aggressive corrective action to improve the condition of the bank if long-term goals of expansion and service to the community are to be met.

The FRB attributed Liberty Bank's unsatisfactory condition to "unsound lending practices and inadequate supervision" and recommended formal supervisory action.

After the release of the 1985 report, Malmberg and officials from the FRB decided to adopt a coordinated regulatory approach to Liberty Bank. A special written agreement was signed December 17, 1985, by Oldfield, who subsequently replaced Malmberg as the supervisor of banking, Wood, the vice president of the FRB in San Francisco, and the 10 members of the Liberty Bank board of directors. The agreement was an aggressive business plan designed to improve lending practices and to institute management reform at the bank.

In October 1986 the FRB conducted another examination. The overall condition of the bank was, again, deemed unsatisfactory. In particular, the FRB reported that the

---

[3]*See* RCW 30.40.020; RCW 30.04.405.

bank's classified assets continued to climb and that the bank was not in compliance with the loan practice requirements of the agreement. The FRB recommended that the bank restore itself to a satisfactory condition before pursuing plans for expansion.

Wood's request for an additional branch office remained pending. Oldfield decided to withhold approval until concerns identified in the reports and the agreement were remedied. Oldfield directed the state bank examiner in charge of monitoring Liberty Bank, John Burke, to pay close attention to Wood's actions and to "keep on [his] back . . . Write down all conversations." *Henderson*, 940 F.2d at 468. Burke subsequently arranged for another examination of Liberty Bank in conjunction with the FDIC. The FDIC report indicated that further deterioration would lead to the bank's failure.

By 1987 it became clear that a capital infusion was critical. On October 21, 1987, the Shamania Investment Company sent a letter to Wood, Andrew Branch, and Jerome Crawford committing to lend them $1,450,000. One week later, the three men sent a packet to Mary Faulk, the Director of Washington's Department of General Administration, containing change of ownership papers, an offer to purchase $870,000 in Liberty stock, and a branch application. The three men made the stock purchase contingent on state approval of the branch application.

An FRB investigation of the proposed purchase raised questions as to its legality. Specifically, documents accompanying the application indicated that the loan from Shamania was secured in part by Liberty Bank stock. It also appeared that three sizable Liberty Bank loans were part of the escrow account that Wood, Branch, and Crawford had established to fund their purchase of Liberty stock. Oldfield denied the application. The parties dispute whether Oldfield was apprised of this information at the time of his denial. But whatever his state of knowledge, an interim November 1987 FRB examination report revealed that Liberty Bank was insolvent.

The situation became very adversarial. When the FRB arrived to conduct its November 1987 examination, Wood met with the board to discuss the possibility of litigation to suspend the examination. Counsel for the bank sent a letter to the FRB requesting suspension of the exam and threatening to file a discrimination action against the state banking division and the relevant federal regulatory agencies. The examination nevertheless proceeded.

The final 1987 report did not come out until February 1988. Oldfield, however, was apparently aware of the examiner's initial findings as early as November or December 1987. The report criticized the board of directors but attributed the bank's insolvency to Wood, stating:

> Management of the bank's affairs has been dominated by President Thomas Wood . . . . He has exerted an extraordinary and increasing degree of influence and control over all aspects of the bank's operations, and his unsatisfactory management has resulted in the bank's current insolvent condition.

*Henderson*, 940 F.2d at 469. The report also noted Wood's opposition to the examination. In particular, Wood told the examiners that the examinations were an enormous burden on the bank and that they were simply part of a conspiracy to harass the minority-owned bank. The federal examiners surmised, however, that Wood's " 'largest concern was that the examination would uncover his inappropriate activities . . .' ". *Henderson*, 940 F.2d at 469.

In December 1987 Branch and Crawford informed Oldfield that they were still interested in recapitalizing Liberty Bank, but they were concerned by Wood's reaction to the 1987 report. They believed that Wood would refuse to resign but told Oldfield that the board would "respond to a strong push from the state". Acting on these comments and his belief that the findings of the 1987 report required decisive action, Oldfield resolved to pressure the board for Wood's termination.[4]

---

[4]Wood contends that Oldfield did not pursue formal removal because he feared the political repercussions.

On December 21, 1987, Oldfield met with the Liberty Bank board of directors, which included Wood, to advise them of the FRB's findings. Oldfield told the board that he wanted action by the next Tuesday or he would begin the process of exercising his regulatory powers. Oldfield also met separately with two board members and indicated that they should ask for Wood's resignation. The two board members relayed their conversation with Oldfield to the board and noted Oldfield's and several board members' concern about the source of funds for the proposed stock purchase. Wood refused to resign, arguing that under Washington law, Oldfield could remove him only upon written notice advising him of the grounds for removal and setting a hearing date.[5]

On December 27, 1987, the board terminated Wood for cause, stating that: (1) he had failed to follow bank policy in making loans, (2) he had failed to bring the bank into compliance with a 1987 state supervisory directive, and (3) those failures caused injury to Liberty Bank's interests. The next day, Oldfield met with members of the board to coordinate their public statements and to give his assurance that a new branch would be approved after the Bank's capitalization needs were met.

In January 1988 Oldfield contacted attorneys at the banking fraud section of the United States Attorney's office to report irregularities. On January 20, 1988, the State appointed William Rhodes as the conservator of Liberty Bank. Oldfield issued a press release citing "bad loans and other management errors" as the reason for placing Liberty under conservatorship. Rhodes granted permission to the first of several interviews by the press.

During a March 2, 1988, Liberty Bank board meeting, Rhodes stated that he was searching for evidence of fraud or kickbacks by Wood. Rhodes expressed his view that proof of kickbacks by Wood would "put one more noose around that man's neck. He deserves to be standing and bleeding somewhere on I-5, I think." He did acknowledge, however, that "deep as we can dig, we haven't found anything like that."

---

[5]*See* RCW 30.12.040; RCW 30.12.042; RCW 30.04.470.

Rhodes also discussed with board members the bad publicity surrounding Wood's termination. He stated that once Liberty Bank's lawsuit was filed against Andy's Draperies, a Liberty Bank loan customer believed to be involved in the allegedly fraudulent purchase of Liberty Bank, its reasons for terminating Wood would be public.

Later in the same month, Liberty Bank initiated a lawsuit against Wood, alleging fraud and conspiracy and seeking recovery on moneys due. Rhodes provided the press with copies of the complaint.[6] Rhodes also provided the press with an affidavit prepared by bank examiner Burke (hereinafter "the Burke affidavit").[7] Liberty Bank used the Burke affidavit to support a successful motion for a temporary restraining order (TRO) for establishment of a receivership against Andy's Draperies. The content of the Burke affidavit included problem loan information and concluded with an opinion that the loan histories tended to show that Wood had fraudulently deceived the loan committee about material facts. The Burke affidavit was never officially filed as part of any lawsuit. The allegations made against Wood in both the complaint and the Burke affidavit appeared in subsequent newspaper articles.

In their effort to save Liberty Bank, Oldfield and Rhodes undertook a plan for recapitalization. As part of the plan, they contacted members of the State Legislature and investors from the community, urging them to lend their support. In June 1988 the plan proved unavailing, and the FDIC closed Liberty Bank. During the same month a new bank, Emerald City, was opened with the full support of the State. Ray Merriwether, a former member of the Liberty Bank board, was named president. Emerald City opened a downtown branch after acquiring the requisite capital infusion.

Responding to the suit filed against him by Liberty Bank, Wood filed a counterclaim, alleging defamation and 42 U.S.C. § 1983 civil rights violations against Oldfield, Rhodes, and board members Merriwether and Joyner. The FDIC entered

---

[6]The parties dispute whether Rhodes contacted the press or vice versa.

[7]Burke is not a defendant in this case.

as a successor in interest when the bank failed and removed the suit to federal court. Later, the FDIC dismissed its claims against Wood.

In 1990 the District Court granted summary judgment on Wood's section 1983 claims and remanded the remaining claims to state court. The Ninth Circuit affirmed. *FDIC v. Henderson*, 940 F.2d 465 (9th Cir. 1991). Wood proceeded to pursue his claims for wrongful interference with a business relationship, defamation, conspiracy, and abuse of process in state court.

In August 1991 Defendants Oldfield and Rhodes moved for summary judgment, arguing that: (1) Wood was collaterally estopped from bringing his wrongful interference claim by the Ninth Circuit's finding that Oldfield had acted reasonably, and (2) Wood's claim for defamation required dismissal given that both Oldfield and Rhodes were entitled to an absolute privilege. On January 21, 1992, Judge Holman denied the motion and dismissed the abuse of process claim. The case went to trial, and the jury rendered a special verdict for Wood on the wrongful interference and defamation claims.[8] Oldfield and Rhodes appeal.

## II
### WRONGFUL INTERFERENCE WITH BUSINESS RELATIONS
### A
### Collateral Estoppel

We first determine whether Wood is collaterally estopped from bringing his claim of wrongful interference with business relations by the Ninth Circuit's finding in *Henderson* that Oldfield's regulatory actions were "eminently reasonable".

In his state claim for wrongful interference, Wood contends that Oldfield used "improper means" to force his termination.[9] Oldfield, in contrast, contends that Wood is

---

[8]Wood dismissed his conspiracy claim during trial.

[9]The tort of wrongful interference with a business relationship requires the following elements: (1) a valid contractual relationship or business expectancy, (2) knowledge of that relationship by the defendants, (3) intentional interference by the defendants inducing or causing a breach or termination of the relation-

collaterally estopped from bringing his claim given that the nature of Oldfield's involvement with Wood's termination has already been litigated at the federal level. Specifically, Oldfield argues that because the Ninth Circuit found his conduct to be reasonable, Wood cannot argue that Oldfield used improper means in pressuring the board for his termination.

In order to obtain the benefit of the doctrine of collateral estoppel, the party asserting it as a bar must establish the following elements:

> (1) the issue decided in the prior adjudication must be identical with the one presented in the second; (2) the prior adjudication must have ended in a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and (4) application of the doctrine must not work an injustice.

(Footnote omitted.) *Hanson v. Snohomish*, 121 Wn.2d 552, 561-62, 852 P.2d 295 (1993) (citing *Malland v. Department of Retirement Sys.*, 103 Wn.2d 484, 489, 694 P.2d 16 (1985); *Rains v. State*, 100 Wn.2d 660, 665, 674 P.2d 165 (1983)).

In this case, the issue turns on the first element. Specifically, we are asked to decide whether there is an identity of issue between Wood's dismissed federal case and the "improper means" element required in a claim for wrongful interference with business relations. In order to reach this issue, however, we must initially determine as a matter of state law whether Oldfield's regulatory authority was limited to the statutory procedure for removal of a bank official under RCW 30.12.040. This threshold determination is critical because the Ninth Circuit's finding as to the nature of Oldfield's conduct has relevance only if we find that the state supervisor of banking is not limited to this procedure. That is to say, if we find that Oldfield was limited to the statutory removal procedure and that he failed to follow it, then the Ninth Circuit's evaluation of Oldfield's conduct has no bearing on this case; a

---

ship or expectancy, (4) *interference by the defendants based on an improper purpose or improper means,* and (5) damages. (Italics ours.) *Sintra, Inc. v. Seattle*, 119 Wn.2d 1, 28, 829 P.2d 765, *cert. denied sub nom. Robinson v. Seattle*, 113 S. Ct. 676 (1992).

failure to follow the required procedure would be improper. If, however, we find that Oldfield was not limited to that procedure, then the Ninth Circuit's evaluation of Oldfield's involvement with Wood's termination becomes relevant.

Washington's statutory procedure for the removal of a bank official provides as follows:

> The supervisor may serve upon a director, officer, or employee of any bank . . . written notice of the supervisor's intention to remove the person from office or to prohibit the person from participation in the conduct of the affairs of the bank . . . whenever:
>
> (1) In the opinion of the supervisor any director, officer, or employee of any bank . . . has committed or engaged in:
>
> (a) Any violation of law or rule or of a cease and desist order which has become final;
>
> (b) Any unsafe or unsound practice in connection with the bank . . .; or
>
> (c) Any act, omission, or practice which constitutes a breach of his fiduciary duty as director, officer, or employee; and
>
> (2) The supervisor determines that:
>
> (a) The bank . . . has suffered or may suffer substantial financial loss or other damage; or
>
> (b) The interests of its depositors could be seriously prejudiced by reason of the violation or practice or breach of fiduciary duty; and
>
> (c) The violation or practice or breach of fiduciary duty is one involving personal dishonesty, recklessness, or incompetence on the part of the director, officer, or employee.

RCW 30.12.040. Two other statutes, RCW 30.12.042 and RCW 30.04.470, set forth the content of the notice and the requirements for a hearing and opportunity for review.

█ Clearly, RCW 30.12.040 provides that the supervisor must comply with the statutory requirements when exercising his or her formal authority to remove. Nothing in RCW 30.12.040, however, requires the supervisor to exercise his formal powers of removal. Rather, once it is determined that an enumerated ground for removal is present and that the requisite degree of harm or prejudice exists, the supervisor may or may not in his discretion pursue removal.[10]

---

[10]*Cf. Feinberg v. FDIC*, 420 F. Supp. 109, 117 & n.16 (D.D.C. 1976) (construing similar statutory language under 12 U.S.C. § 1818(g)(1)). In *Feinberg* the FDIC itself, not the bank board, suspended an officer without a hearing.

Despite the discretionary nature of this provision and the fact that it was the board who removed Wood and not Oldfield, Wood takes the position that Oldfield was obliged to follow the formal removal procedures. In particular, Wood believes that Oldfield's conduct was tantamount to an exercise of his removal discretion and that the statutory procedure should have therefore been followed. We disagree.

In addressing the issue of what regulatory actions can be taken to preserve a bank's funds, federal courts have upheld the practice of "jawboning" as a key bank regulatory mechanism.[11] The term itself refers to the informal practice of threatening formal action in order to ensure bank compliance with regulatory requests. In general, courts have refused to find that the use of this informal practice amounts to an abuse of agency discretion given its effectiveness and the broad scope of regulatory authority afforded to bank regulators. As stated by the Fifth Circuit:

> When a governmental agency holds such great powers over its offspring, even to the point of appointing a conservator or receiver to replace management, it is difficult to hold that an informal request, even demand, to clean house would amount to an abuse of the statutory powers and discretion of the agency.

(Citation omitted.) *Miami Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 414-15 (5th Cir. 1958).

We find especially persuasive the United States Supreme Court's analysis in *United States v. Gaubert*, 499 U.S. 315, 113 L. Ed. 2d 335, 111 S. Ct. 1267 (1991). There, the court held that the Federal Home Loan Bank Board (FHLBB) was not liable to the chairman and largest shareholder of a savings and loan institution after the board of directors followed the "suggestions and advice" of the FHLBB. Specifically, under an FHLBB threat to close the savings and loan unless its management and board of directors were replaced, all of the directors resigned. *Gaubert*, 499 U.S. at 319. Plaintiff

---

[11]*See United States v. Gaubert*, 499 U.S. 315, 113 L. Ed. 2d 335, 111 S. Ct. 1267 1991); *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 10 L. Ed. 2d 915, 83 S. Ct. 1715 (1963); *Miami Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410 5th Cir. 1958).

argued that where specific statutory procedures were provided, application of those procedures was mandatory. The Court disagreed, stating:

> We are unconvinced by Gaubert's assertion that because the agencies did not institute formal proceedings against IASA, they had no discretion to take informal actions as they did. Although the statutes provided only for formal proceedings, there is nothing in the language or structure of the statutes that prevented the regulators from invoking less formal means of supervision of financial institutions. Not only was there no statutory or regulatory mandate which compelled the regulators to act in a particular way, but there was no prohibition against the use of supervisory mechanisms not specifically set forth in statute or regulation.

*Gaubert*, 499 U.S. at 329-30.

The Court's analysis applies here with equal force. Notwithstanding the explicit provision for formal regulatory procedures, nothing in Washington's banking laws prohibits the supervisor from regulating troubled banks through informal means. Indeed, while the supervisor is charged with the responsibility of keeping the banking industry free from illegal activity and unsound banking practices, no specific direction is provided as to how the supervisor should proceed when a problem is discovered. Rather, the supervisor is simply armed with a number of enforcement mechanisms, all of which are discretionary.

We therefore conclude that in light of the broad discretion afforded to the supervisor under Washington banking laws and the absence of any statutory direction to indicate otherwise, the state supervisor of banking is not limited to formal regulatory procedures when dealing with potentially illegal or unsound banking practices.[12] Were we to hold otherwise,

---

[12] In *FDIC v. Henderson, supra*, the Ninth Circuit stated: "[T]he state regulations [RCW 30.12.040-.042 and RCW 30.04.470] clearly imposed limits on the circumstances under which Oldfield could terminate Wood as president of Liberty — *i.e.* only after notice, a hearing, and with judicial review." *Henderson*, 940 F.2d at 475. This is certainly a correct statement of the law. The supervisor must honor the procedural requirements set forth by statute when exercising his formal removal power. It does not, however, answer the question of whether Oldfield was limited, under state law, to the exercise of his formal regulatory powers.

the supervisor of banking would be substantially restricted in his or her ability to provide a flexible response to "complex and rapidly changing circumstances of banking activity" and to matters that affect the public interest. *See FDIC v. Irwin*, 916 F.2d 1051, 1054 (5th Cir. 1990).[13]

█ Having determined as a matter of state law that Oldfield's regulatory authority was not limited to the statutory removal procedure under RCW 30.12.040, a finding of improper means on that basis is therefore foreclosed. The question now is whether the Ninth Circuit's finding as to the nature of Oldfield's conduct precludes Wood's claim that Oldfield otherwise acted wrongfully. We hold that it does.

In *FDIC v. Henderson, supra*, the Ninth Circuit was asked to determine whether the district court erred in granting Oldfield's motion for summary judgment on Wood's race-based equal protection and due process claims. In affirming the award of summary judgment, the Ninth Circuit determined that Oldfield's actions were not racially motivated and that, in fact, Oldfield's actions were "eminently reasonable" and not "arbitrary or unreasonable". *Henderson*, 940 F.2d at 474.

In so holding, the Ninth Circuit effectively determined the basic issues as to the nature of Oldfield's conduct. Indeed, the court was consistently of the view that the negative examination reports and Oldfield's concern regarding the legality of the stock purchase plan justified his conduct. Therefore, because Wood has alleged identical facts in state court to support his claim for wrongful interference, we hold that the Ninth Circuit's finding of reasonable conduct precludes any subsequent finding of wrongfulness.

Wood nevertheless contends that the application of the collateral estoppel doctrine in this case would be unjust. In particular, he claims that it would be grossly unfair to give

---

[13]Wood contends that even if "jawboning" is an acceptable regulatory activity, Oldfield's conduct went beyond its permissible scope. While acknowledging that there may be limits to the use of jawboning, we nevertheless find that the acts of which Wood complains were before the Ninth Circuit when it evaluated his regulatory conduct.

preclusive effect to the Ninth Circuit's findings when a unanimous jury rendered a verdict in support of his claim. We disagree.

The purpose of collateral estoppel is to prevent relitigation, not to determine whether another factfinder viewed the verdict differently. Moreover, the jury's verdict is not surprising given that instruction 22 essentially directed a verdict in Wood's favor. The instruction states:

> In determining whether defendant Oldfield used improper means in wrongfully interfering with Wood's business relationship and/or whether he acted in good faith in the performance of his duty, you should consider that, under Washington law, the Supervisor of Banking may remove a bank officer from office only after [following the outlined procedures.]

As we have indicated above, Oldfield was not limited to the formal removal statute. Rather, Oldfield was entitled to pursue informal means in order to effectuate Wood's removal. The instruction as given, however, tells the jury that formal removal pursuant to the statutory procedure was the only lawful course of conduct that Oldfield could take in seeking to bring about Wood's removal. In the context of this case, instruction 22 is not an accurate statement of the law, and its effect was to direct a verdict to preclude Oldfield's good faith defense.[14] Specifically, the jury could not find that Oldfield acted in good faith after having been instructed that Oldfield's actions did not comply with the only lawful method of removal. Thus, we reject Wood's claim to the contrary and find that he is collaterally estopped from bringing his claim of wrongful interference with business relations.

## B

## Admissibility of Evidence

Oldfield claims the trial court erred by excluding the following evidence at trial: the bank examiners' testimony, the state and federal bank examination reports, and the testimony of three witnesses who claimed their Fifth Amend-

---

[14]*See* RCW 43.19.030 (providing supervisor of banking with immunity for "any act done by him in good faith in the performance of his duties").

ment privilege. Oldfield also claims that the trial court erred by admitting an affidavit by Eric DeGooyer.

On appeal, Oldfield assigns error to these rulings only as they relate to the wrongful interference claim. Therefore, given our disposition of that claim, we need not determine whether the trial court erred in making those rulings.

## III

### DEFAMATION

We next decide whether Defendants were absolutely immune from Wood's defamation claims.

Prior to trial Defendants moved for summary judgment, seeking dismissal of Wood's defamation claims. The trial court denied the motion, finding, *inter alia*, that because the Burke affidavit was never officially filed as a court document, it could not be absolutely privileged.[15]

Defendants assign error to the trial court's ruling, arguing that the use of the affidavit in the TRO proceeding, despite the absence of filing, was sufficient to render it absolutely privileged. It is true that a defamatory statement made by a party or counsel during a judicial proceeding is absolutely privileged if it is pertinent or material to the redress or relief sought. *E.g., McNeal v. Allen*, 95 Wn.2d 265, 267, 621 P.2d 1285 (1980) (citing *Gold Seal Chinchillas, Inc. v. State*, 69 Wn.2d 828, 420 P.2d 698 (1966)). Wood's claim for defamation, however, is not predicated on the original publication.[16] Rather, Wood contends that he was defamed through Defendants' republication of statements contained in the Burke affidavit and other pleadings provided to the press, as well as by statements made by Oldfield and Rhodes directly to the press.

---

[15]Defendants acknowledge their mistake in assuming the Burke affidavit had been filed. However, contrary to the dissent's assertion, they do not acknowledge that republication of the affidavit was in error. Defendants have consistently argued under *Gold Seal Chinchillas, Inc. v. State*, 69 Wn.2d 828, 420 P.2d 698 (1966) that they were absolutely privileged to do so under the official function privilege.

[16]Because Wood in no way asserts that his claim is based on publication in a judicial proceeding, we need not reach the issue of whether the statements made in the Burke affidavit were absolutely privileged in that context, despite the absence of filing.

The question, therefore, is whether Defendants were otherwise privileged to make the allegedly defamatory statements and publications outside the context of litigation. Defendants contend they were protected by an absolute privilege applicable to executive communications.

The common law has long extended an absolute privilege from liability for defamation to executive officials properly discharging an official duty. *See generally* W. Page Keeton et al., *Prosser and Keeton on Torts* § 114, at 821-23 (5th ed. 1984); Restatement (Second) of Torts § 591 (1977). The privilege serves the public policy of promoting freedom in the exercise of official duties without the hindrance of lawsuits based on acts done in the course of such duties; such lawsuits would consume time and energy that would otherwise be devoted to governmental service, and the threat of which might inhibit the vigorous administration of governmental policy. Restatement § 591 cmt. a; *Barr v. Matteo*, 360 U.S. 564, 571, 3 L. Ed. 2d 1434, 79 S. Ct. 1335 (1959). Because the privilege is absolute, no action can be maintained against an officer who comes within its scope, irrespective of his or her purpose in making the publication. Restatement § 591 cmt. d; *Keeton*, at 816 (where considerations of policy require absolute immunity, privilege applies without regard to purpose, motive, or reasonableness of conduct); *see also Dugas v. Harahan*, 978 F.2d 193, 196 (5th Cir. 1992) ("[t]he privilege attaches to communications by public officials no matter how false, malicious, or badly motivated the communication may be"), *cert. denied*, 114 S. Ct. 60 (1993).

The Restatement defines the scope of this privilege as follows:

> The absolute privilege . . . exists only when the officer . . . publishes the defamatory matter in the performance of his official duties, or within the scope of his line of duty. This does not mean that the publication must be one that the officer in question is required to make . . . It is enough that the publication is one that the officer is authorized to make in his capacity as an officer. Thus the head of a federal or state department

may be authorized to issue press releases giving the public information concerning the conduct of the department, or events of public interest that have occurred in connection with it; and if he is so authorized he is within the scope of his official duties when he gives the information to the press.

Restatement § 591 cmt. f. As acknowledged by Wood, the existence of an absolute privilege is a question of law for the court to decide. Restatement § 619(1) & cmt. a; *see also, e.g., Demopolisv. Peoples Nat'l Bank*, 59 Wn. App. 105, 110, 796 P.2d 426 (1990); *Messerly v. Asamera Minerals, Inc. (U.S.)*, 55 Wn. App. 811, 818, 780 P.2d 1327 (1989).

In *Gold Seal Chinchillas, Inc. v. State*, 69 Wn.2d 828, 420 P.2d 698 (1966), our Supreme Court recognized application of these principles to Washington state officers and officials: "state officials . . . are absolutely privileged with respect to the content of their oral pronouncements or written publications", so long as the allegedly defamatory statement has "some relation to the general matters committed by law to the control or supervision of the particular state official." *Gold Seal Chinchillas*, 69 Wn.2d at 834.

In *Gold Seal Chinchillas*, the Attorney General's office issued a press release concerning a recently filed lawsuit alleging violations of the Consumer Protection Act. The defendants in the consumer protection suit initiated a libel action against the state. The Supreme Court affirmed the dismissal of the complaint on grounds that the Attorney General and his staff were absolutely privileged to make the statements contained in the press release because they were public officials speaking "with respect to their official duties." *Gold Seal Chinchillas*, 69 Wn.2d at 833.

The court rejected plaintiffs' argument that the privilege was inapplicable because the Attorney General had no specific statutory duty to inform the public concerning initiation of litigation: "No statutory delineation of such responsibility is necessary . . . inasmuch as the Attorney General . . . has an implicit duty by virtue of his position to inform the people of the state of Washington of actions taken in his official capacity." *Gold Seal Chinchillas*, 69 Wn.2d at 833. The acts complained of need only "have more than a tenuous

relation" to the declarant's official capacity. *Gold Seal Chinchillas*, 69 Wn.2d at 834.

Thus, for an official to come within the scope of this privilege, it need only be established that the proponent is "among that class of officials absolutely privileged to publish defamatory matter", and that "the publication has more than a tenuous relation to [his or her] official capacity." *Sidor v. Public Disclosure Comm'n*, 25 Wn. App. 127, 133, 607 P.2d 859, *review denied*, 93 Wn.2d 1020 (1980); *cf. Barr*, 360 U.S. at 573, 575 (publication must be within "the outer perimeter" of the official's "line of duty").

Wood argues that the Defendants here — the supervisor of banking and a duly appointed conservator — were not among the class of executive officials protected by the privilege. Wood contends that the *Gold Seal Chinchillas* court "drew the line" at elected officials of cabinet rank. Br. of Resp't, at 75. But the *Gold Seal Chinchillas* opinion reveals no intent of the Supreme Court to delineate such a line. It is true that some state courts have limited the privilege to superior officers of state government, but "[a] good number of the States have gone further, and have extended the absolute privilege to state officers of various ranks below that of cabinet level." Restatement § 591 cmt. c; *see also* Keeton, at 822 n.80; 8 Stuart M. Speiser et al., *American Law of Torts* § 29:94, at 636-37 & n.42 (1991) (in some states, inferior officers are deemed entitled to an absolute privilege).

We need not now decide how far Washington should extend the official communication privilege to inferior officers, for the privilege has already been extended to appointed officers indistinguishable in "rank" from the supervisor of banking. *See Sidor*, 25 Wn. App. at 133 (privilege attaches to members of public disclosure commission, who are appointed by the Governor to enforce the public disclosure law); *Stidham v. Department of Licensing*, 30 Wn. App. 611, 614, 637 P.2d 970 (1981) (privilege attaches to Director of Department of Licensing). We are convinced that the state supervisor of banking is among those Washington state officials to whom the absolute executive communication privilege

should extend. *Cf. Saroyan v. Burkett,* 57 Cal. 2d 706, 371 P.2d 293, 21 Cal. Rptr. 557 (1962) (extending absolute privilege to state superintendent of banks).[17]

Second, the allegedly defamatory statements had more than a tenuous relationship to Defendants' official capacities. In issuing press releases and providing copies of pleadings to the press, Defendants were informing the public of official actions of the state supervisor of banking. The supervisor is clothed with the power and broad discretion to govern the administration of RCW Title 30, the state law regulating banks and trust companies. The supervisor exercises these powers "to facilitate the delivery of financial services to the citizens of the state of Washington". RCW 30.04.030. The supervisor has broad administrative discretion in the event of the discovery of unsound banking operations, *i.e.,* if it appears that any bank is in an unsafe condition that "render[s] the continuance of its business hazardous to the public or to its depositors and creditors". RCW 30.46.020, .090.

Here, the soundness of Liberty's banking operations was in question. Moreover, the integrity of the supervisor's activities in connection with Liberty Bank had been publicly challenged in newspaper articles, which reported criticisms of his treatment of Liberty Bank.[18] Clearly, the public had

---

[17]As for Defendant Rhodes, he was appointed conservator of Liberty Bank by Oldfield in 1988, pursuant to the provisions of RCW 30.46.040, which also delineates the power of the conservator and requires the conservator to make reports to the supervisor. We believe that under this scheme, a conservator is imbued with the supervisor's character and partakes of his immunity to liability whenever the supervisor would be entitled to it. *Cf. Gold Seal Chinchillas,* 69 Wn.2d at 833 (Attorney General's immunity extends to staff); *Barr,* 360 U.S. at 572-73 ("[t]he privilege is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government").

[18]By late 1987 newspapers had developed a keen interest in the "bank in Seattle which had been waging war with the regulators". In October 1987 Wood wrote a letter to the Governor claiming that Liberty's application to open a downtown branch had been hampered by "prejudicial treatment toward the Black population". The November 1987 letter sent by Liberty Bank's attorneys to Mary Faulk and the FRB, accusing Oldfield of acts of deception "aimed at crippling the bank" and threatening a federal discrimination action, had also been sent to the Governor, United States senators and representatives, and state

more than an idle interest and concern in the actions of this particular office of state government, and Defendants' contacts with the press facilitated the public's right to be kept informed of actions taken to abate the unsafe condition of Liberty Bank. *See Gold Seal Chinchillas*, 69 Wn.2d at 833 (relevant need for public knowledge includes awareness that the Attorney General "is adequately performing the duties of his office and is meeting his responsibilities to the electorate"); *Saroyan*, 371 P.2d at 296 (state superintendent of banks within scope of privilege when he "defended the policy of his department, and his statements were related to the defense of that policy"). We think that under these circumstances a publicly expressed defense of the supervisor's position following charges of racially discriminatory practices was an appropriate exercise of the discretion that the supervisor of banking must possess to function effectively.[19] Thus, applying immunity here is consistent with the policies of keeping the public informed of the public's business, protecting government officials in the exercise of their discretion, and promoting the public interest in the unhindered exercise of official authority.

To be sure, balancing the public's right to know against a defamed individual's right to redress is a sensitive task. In this instance, where the balance is struck in favor of the public's right to know, the plaintiff's right to recover something by way of defamation damages justifiably yields to the need of a democratic society to be apprised of the conduct of the public business by its public officials. *See Engelmohr v. Bache*, 66 Wn.2d 103, 104, 401 P.2d 346 (1965) ("protection of

legislators. Wood additionally met with FRB officials and black state legislators to complain about Oldfield's "outrageous conduct". During this period, Liberty officials had made public comments, reported in the press, charging that racism had played a part in the supervisor's dealings with Liberty. See Pls. exs. 28, 29.

[19]The dissent argues, without citation to authority, that the official function privilege is somehow time barred because the challenged statements related to past actions of the supervisor. We disagree. One of the purposes of the privilege — facilitating the public's right to be informed regarding official governmental actions — was clearly applicable to the republication of statements contained in the Burke affidavit.

the individual's interest in his reputation must yield to the public good, to permit the free function of the processes of government"); *Barr*, 360 U.S. at 576 ("there may be occasional instances of actual injustice which will go unredressed, but we think that price a necessary one to pay for the greater good").

The supervisor's motives in seeking Wood's termination were hotly debated at trial, but that is not the issue here. The Defendants had an *absolute* privilege to communicate to the public the allegedly defamatory reasons for the supervisor's actions. *See Stidham*, 30 Wn. App. at 615 ("defendants' motives, whatever they may be, are of no consequence"); *Barr*, 360 U.S. at 575 ("The claim of an unworthy purpose does not destroy the privilege") (quoting *Tenney v. Brandhove*, 341 U.S. 367, 377, 95 L. Ed. 1019, 71 S. Ct. 783 (1951)). Hence, it is of no consequence that, as argued by Wood, the Defendants may have also harbored a personal desire to "publicly spread the word regarding Wood's demise". Br. of Resp't, at 72 n.45. Where the occasion for allegedly defamatory statements is objectively interchangeable with one that might have occurred in the disinterested exercise of official duty, an incidental personal motive is irrelevant. *See Kilgore v. Younger*, 30 Cal. 3d 770, 779, 640 P.2d 793, 798, 180 Cal. Rptr. 657 (1982) (rejecting argument that defendant was not performing an "official duty" because his statements were politically motivated where alleged activity "though it may well have been taken to produce a popular and appealing . . . image", was indistinguishable from actions initiated by public officials oblivious to political ramifications).[20]

To sum up our holding as to the defamation claim, we hold as a matter of law that summary judgment should have been granted as to the challenged press releases on the basis of absolute privilege. Our holding, however, pertains only to the statements and publications, including the Burke

[20]In *Williams v. Gorton*, 529 F.2d 668 (9th Cir. 1976), the Ninth Circuit merely recognized that the immunity described in *Gold Seal Chinchillas* is limited to those pronouncements made in the official's public role. In that case, the court refused to apply the absolute privilege as a matter of law because Attorney General's campaign-related statements "could be shown to be *purely* electioneering in a private capacity." (Italics ours.) *Williams*, 529 F.2d at 672.

affidavit, made by the Defendants to the press. There was also evidence of other alleged statements which may be included in Wood's defamation claim, such as letters sent to legislators and statements made to bank board members. These statements appear to be relatively innocuous and may well not be defamatory, or may be protected by an absolute or qualified privilege. The statements were only fleetingly referenced in the summary judgment materials submitted to the trial court and were not directly addressed by the trial court's summary judgment ruling. Hence we remand for such further proceedings as to such statements as the parties and the trial court may deem appropriate.

Appellants have also assigned error to many of the trial court's instructional rulings, to the verdict form, and to the amount of the verdict. We need not discuss all of these issues and their many ramifications. Although the instructions are confusing and, arguably, at times incorrect, few of the alleged errors were properly preserved below. Moreover, had the defamation claims been properly narrowed on summary judgment, many of the instructional issues might never have arisen at all. Hence, it is enough to dispose of this case on the grounds already discussed, leaving the parties and the trial court free, within the confines of the scope of our remand, to revisit only those issues germane to a possible second trial of this case.

## IV

### CONCLUSION

We reverse and dismiss Wood's wrongful interference claim, reverse and dismiss Wood's defamation claim in part, and remand for further proceedings.

PEKELIS, A.C.J., concurs.

COLEMAN, J. (concurring in part, dissenting in part) — I concur in the majority's disposition of the wrongful interference claim. I disagree, however, with the resolution of the

defamation claim and, therefore, dissent from that portion of the majority's opinion.

In determining whether a party is entitled to the benefit of a privilege, the court must, at the outset, examine the purpose of the privilege. If the court finds that extending the privilege furthers its intended purpose, then the application of the privilege is appropriate. In this case, the majority holds that, under the *Gold Seal* official function privilege, Defendants Oldfield and Rhodes were entitled to absolute immunity from all liability for their publication of the allegedly defamatory statements contained in the Burke affidavit. *See Gold Seal Chinchillas, Inc. v. State*, 69 Wn.2d 828, 420 P.2d 698 (1966). Because I believe that the Defendants' conduct went beyond the purpose that the *Gold Seal* privilege was intended to serve, I respectfully dissent.

*Gold Seal* provides that state officials have an absolute privilege to publish statements, regardless of whether they are potentially defamatory in nature, as long as the subject matter of those statements has more than a tenuous relation to matters committed by law to the control or supervision of the official's office. *Gold Seal*, at 834. The purpose of this privilege is to allow public officials to take and announce action without fear of reprisal. *See Gold Seal*, at 833. The scope of this privilege is not so broad, however, that it vests public officials with a continuing absolute privilege to defame others for the sole purpose of defending actions already taken and explained.

Here, Oldfield had taken action regarding Wood's termination in December 1987. Oldfield informed the public about this action by issuing several press releases. In January 1988, Rhodes was appointed conservator of Liberty Bank and, again, various press releases were issued and interviews were granted, explaining to the public the reasons for the action taken (*i.e.*, poor management and bad loans). Under *Gold Seal*, Oldfield and Rhodes were entitled to inform the public and explain their reasons for their actions with absolute immunity. Several months later, however, public criticism continued regarding Wood's termination. In

early April 1988, Liberty Bank commenced the Andy's Draperies suit. The record shows that Rhodes released the Burke affidavit and the complaint to the press not to explain or advance that suit, but to retroactively defend and rebut public criticism about Wood's termination.

Under these circumstances, the reason for the broad protection and right to defame with absolute immunity no longer applies. The *Gold Seal* privilege is designed to accomplish a limited function; namely, to inform the public and to protect public officials with respect to the initiation or commencement of official action. Because Defendants Oldfield and Rhodes were defending action already announced and taken, they were not entitled to the broad scope of protection afforded under the *Gold Seal* official function privilege. Indeed, even Defendants Oldfield and Rhodes did not take such a broad view of the privilege, acknowledging that the release of the unfiled affidavit was made in error.

This is not to say that Defendants Oldfield and Rhodes were entirely without protection. In the context of this case, they had a qualified privilege to publish statements, even if defamatory, as long as they were acting in the good faith performance of their official duties. *See* RCW 43.19.030. As argued to the jury, there were factual questions about whether Oldfield and Rhodes released the affidavit in good faith, because they apparently knew that no direct evidence of fraud had been uncovered during the months following Wood's termination.

Thus, contrary to the majority, I would affirm the defamation portion of the verdict. In light of the court's disposition, it is unnecessary to address the other issues related to that claim in detail. Suffice it to say, Defendants' additional assignments of error either do not constitute reversible error or were not properly preserved for appeal.

Review denied at 126 Wn.2d 1002 (1995).