[No. 19718-9-II.   Division Two.   January 16, 1998.]

JACK M. AITKEN, *Appellant*, v. BETTY J. REED, ET AL., *Respondents*.

*Paul A. Lindenmuth* of *Law Offices of Neil J. Hoff*, for appellant.

*Christine O. Gregoire, Attorney General*, and *Michael P. Lynch, Assistant*, for respondents.

ARMSTRONG, J. — TAPCO credit union fired Jack Aitken, its CEO, after Betty Reed, the State Supervisor of Savings and Loans and Credit Unions, told TAPCO's Board of Directors that she would remove him pursuant to her statutory authority if the Board did not. For several years, Reed had questioned TAPCO's bookkeeping method of carrying losses in the value of mutual funds owned by TAPCO. During the dispute, Aitken criticized Reed's policy on how the stock losses should be carried on TAPCO's books. Ultimately, Reed believed that Aitken was violating her written directives and falsifying TAPCO's books. Thus, her ultimatum to the Board.

Aitken sued Reed and the State, alleging claims for retaliation against protected speech, discrimination on the basis of age and gender, denial of property and liberty interests without due process of law, defamation, tortious interference with a contractual relationship, and outrage. Aitken appeals a summary judgment in favor of Reed and the State. We affirm.

## FACTS

Jack Aitken was the long-time CEO of the TAPCO credit union. In October 1989, he was dismissed by the TAPCO Board of Directors. He was fired after Betty Reed, the State Supervisor of Savings and Loans and Credit Unions, had repeatedly lobbied the TAPCO Board for a "change" in the management of TAPCO.

Reed attended the meeting when the Board decided to fire Aitken and told the Board she intended to remove Aitken pursuant to her statutory authority if the Board did not. Reed also gave the Board a draft of the charges she intended to file against Aitken. Aitken was not permitted to be present for the Board's repeated meetings with Reed, though he normally attended Board meetings.

The trouble started on "Black Monday" in September 1987, when the stock market plunged. At the time, TAPCO

had approximately 12 percent of its assets invested in mutual funds. The amount of the investment put TAPCO in violation of WAC 419-36-090, which requires a credit union to get State approval to invest more than 10 percent in stocks. TAPCO had not gotten approval for its investment and TAPCO suffered a substantial loss in the value of its mutual funds on "Black Monday."

Meeting with the managers of a number of credit unions to discuss the problem, Reed addressed the group as, "[W]ell, boys[,] this is what [you're] going to do . . . ." She then directed the credit unions to carry the mutual fund investments at the lesser of the current market value or the purchase price. Given the decline in the market value, this directive forced the credit unions to list these investments as substantial losses, and to mark such losses off against the "undivided profits."[1]

But Reed permitted credit unions to individually request exemptions from this policy. TAPCO requested such an exemption, and was told that it could set up a "contra" reserve account to the regular reserves.[2] Reed claims that she made clear that this was a one-time exemption. Aitken denies this.

In October 1988, state regulators audited TAPCO. The regulators gave TAPCO a CAMEL rating of 2.[3] At the end of 1988, TAPCO submitted its year-end Financial and Statistical Report, which showed that Aitken had increased the special reserve by $119,068.48.

Concerned about this increase, Reed contacted Aitken in

---

[1]The undivided profits are the funds used to pay dividends to credit union members.

[2]Reserve accounts are money that a credit union must keep on hand in the event of a defaulted loan, bad check, etc., so that it can provide members with their deposits. A credit union that was 100 percent "loaned out" could not give members back their deposits upon demand, and could be seriously impacted if a loan were defaulted simultaneously with members requesting their deposits. These reserve accounts are used to prevent a "run" on the credit union.

[3]The CAMEL system rates the financial health of Credit Unions. It assigns ratings from 1-5 in five different areas: capital; asset quality; management; earnings; and liquidity. From these ratings a composite rating is derived. The scale runs from a 1 (good/ very healthy) to a 5 (poor/ unstable).

January 1989 and directed TAPCO to book the mutual fund losses to the undivided profits instead of to the contra reserve account. Reed also sent a letter to all credit union managers in March 1989, dictating that all mutual fund losses were to be accounted for against the undivided profits.

In March 1989, Aitken wrote Reed and asked for another exemption from carrying its mutual fund losses against undivided profits. Reed denied the request.

Aitken then talked to a fellow credit union manager about the problem, who in turn contacted the President of the Washington Credit Union League, Bruce Rourillard. Rourillard in turn wrote Reed a letter suggesting alternatives to marking the funds off against undivided profits.

Worried that TAPCO might declare a dividend at the end of March 1989 even though it did not have sufficient undivided profits, Reed asked to meet with the Board at their March 30 meeting. This request was denied. Reed claims that Aitken assured her that her concerns would be passed on to the Board and that no dividend would be declared at the meeting. Reed hand-delivered a letter, either on the date of this meeting or the day after,[4] instructing Aitken to charge the mutual fund losses to the undivided profits, and reminding him that a dividend could be declared only out of the undivided profits.

At this meeting the Board declared a dividend. The Board based the dividend on an incorrect estimate of earnings. In fact, if TAPCO had recorded its mutual fund losses as directed by Reed, it would not have had sufficient undivided profits to pay the dividend. Because of this, Aitken charged off an additional $49,000 to the contra reserve account so that the credit union could pay the dividend that the Board had declared. Reed used this incident as the basis for the first of her draft charges against Aitken in October 1989.

Reed met with the TAPCO Board on April 27, 1989. At that meeting, Reed presented the Board with a cease and

---

[4]The date of delivery is disputed.

desist order directing TAPCO to account for the mutual fund losses as she had directed. Reed also suggested that "a change" was required in the management of the credit union.

In June 1989, Reed received a phone call from an accountant at TAPCO, Lisa Olthoff. Olthoff told Reed that Aitken was improperly accounting for losses being sustained by its wholly owned subsidiary, CUSO. TAPCO's independent auditors had learned that TAPCO was not transferring CUSO's losses, which should have been entered against undivided profits, to its own books. The auditors had instructed Aitken to immediately enter the CUSO losses on TAPCO's books against undivided profits. But, according to Olthoff, Aitken then told her not to enter the losses. Reed ordered Aitken to mark these losses off against the undivided profits instead of against the regular reserves, which are normally utilized for loan losses. This incident constituted the second of the draft charges against Aitken.

Also in June, Reed ordered a new audit of the credit union. This examination, which Aitken contends was motivated by an effort to provide a rationale for his removal, concluded that TAPCO was in financial trouble and gave TAPCO a CAMEL rating of 4. Aitken disputed these results and sent two letters to Reed responding to the exam results.

During this same period, Reed had several phone conversations with TAPCO attorney Steve Levy and TAPCO Board Chairman John Roller, urging them to change TAPCO's management. Finally, after Reed presented her draft charges, the Board voted to remove Aitken in October 1989.

During a subsequent wrongful-termination suit against TAPCO, Aitken learned of Reed's role in his termination. Aitken then instituted a civil suit against Reed, alleging violations of his constitutional rights and state law tort claims. The constitutional claims, filed under 42 USC § 1983, included retaliation against protected speech in

violation of the First Amendment, and denials of a property interest without due process of law, of a liberty interest without due process of law, and of a "substantive" due process right to be free of age and gender discrimination, in violation of the Fourteenth Amendment. Aitken also alleged claims for defamation, tortious interference with a contractual relationship, outrage, and age and gender discrimination under chapter 49.60 RCW. Summary judgment was granted for Reed on all claims.

## ANALYSIS

■■ In reviewing a summary judgment, we engage in the same inquiry as the trial court. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). Summary judgment may be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Weyerhaeuser Co. v. Aetna Cas. & Sur. Co.*, 123 Wn.2d 891, 897, 874 P.2d 142 (1994). A material fact is one upon which the outcome of the litigation depends. *Clements v. Travelers Indem. Co.*, 121 Wn.2d 243, 249, 850 P.2d 1298 (1993). In ruling on the motion, we consider the facts in the light most favorable to the nonmoving party. *Clements*, 121 Wn.2d at 249.

Section 1983: Retaliation Against Protected Free Speech

The parties agree that an analysis similar to that conducted in a public employment context is appropriate, since public employment cases often concern Section 1983 property and liberty interests similar to those asserted by Aitken.[5]

■ To establish a prima facie case of retaliation against protected speech, Aitken must demonstrate that his speech

---

[5]"[W]here the actions of private individuals operate to deprive an individual of his employment, a suit for interference with private contractual relationships would lie, but where government officials are involved, the nature of the interest at stake in private employment is a property interest." *Merritt v. Mackey*, 827 F.2d 1368, 1371 (9th Cir. 1987).

was protected by the First Amendment and that the speech was a substantial or motivating factor in Reed's decisions adverse to him. *White v. State*, 131 Wn.2d 1, 10, 929 P.2d 396 (1997). Because Aitken has not presented evidence sufficient to survive a summary judgment that his speech was a substantial factor in Reed's alleged retaliation, we address only this element.

Aitken claims that he was punished because of (1) several conversations with Reed in which he expressed disagreement with her policy on reserving the mutual fund losses, and (2) the Rourillard letter of March 24, 1989, which also questioned the policy. Although the letter was not written by Aitken, Reed was apparently aware that Aitken was behind it. Reed conceded that she was upset with Rourillard for presenting the complaints of Aitken and others concerning the accounting directive. But she explained that she was upset at Rourillard only for representing a Credit Union League member's view, which Rourillard agreed was wrong, because that League member threatened to stop paying dues.

Reed and TAPCO had a well-documented running dispute over TAPCO's financial condition and bookkeeping methods—centering around the mutual fund and CUSO losses. It is undisputed that TAPCO violated WAC 419-36--090 when it invested more than 10 percent of its assets in mutual funds without State approval. Furthermore, although Aitken denies that Reed told him the initial exemption granted to TAPCO on reserving the mutual fund losses was one-time only, he concedes that in January 1989 Reed told him not to charge any more mutual fund losses to the contra reserve account. In spite of this, in April 1989 TAPCO added over $49,000 of losses against the regular reserves to the contra reserve account. TAPCO also declared a quarterly dividend at the end of March 1989 over Reed's expressed concerns that it did not have sufficient undivided profits. In addition, TAPCO did not immediately enter the CUSO losses on its books as directed by Reed in June of 1989—an entry that could have

prevented TAPCO from declaring a quarterly dividend. Aitken does not deny these problems, but explains that (1) he did not see and was not aware of WAC 419-36-090, (2) the March dividend was inadvertently declared based on inaccurate information provided by TAPCO's accounting department, and (3) he did not instruct Olthoff not to enter the losses on the books, but only to defer entering them until the next quarter. Nevertheless, as a result of these irregularities, TAPCO agreed to negotiate a cease and desist order with the State. We believe the record is persuasive that Reed acted because of the TAPCO's precarious financial condition—a conclusion with which TAPCO's independent auditors agreed.[6] We hold that no reasonable juror could conclude that Reed was retaliating against Aitken for his criticism of her policy on reserving the mutual fund losses.

Section 1983 Denial of a Property Interest Without Due Process of Law

■ Aitken next claims that he was denied a property interest in his employment without due process of law. *Winegar v. Des Moines Indep. Sch. Dist.*, 20 F.3d 895 (8th Cir. 1994), summarizes the rules for such a claim:

> A person must have a legitimate claim of entitlement to his or her employment to have a property interest in it. The existence of a property interest must be determined with reference to state law. Typically, this interest arises from contractual or statutory limitations on the employer's ability to terminate an employee. A property interest in employment can also be created by implied contract, arising out of customs, practices, and de facto policies. When such a property interest exists, the employee is entitled to a hearing or some related form of due process before being deprived of the interest.

*Winegar*, 20 F.3d at 899 (citations omitted).

We first consider whether Aitken had a protected prop-

---

[6]In June 1989 the auditors found the TAPCO's undivided earnings were depleted and in a negative state and warned that without immediate and stringent measures TAPCO would surely fail.

erty interest in his job. In the related case of *Aitken v. TAPCO*, the superior court ruled that Aitken had a contract with TAPCO terminable solely for "just cause" following progressive discipline unless the termination was for gross misconduct. This contract was based upon the 1986 Employment Manual at TAPCO. Thus, Aitken established a property interest in his employment. And it is undisputed that he was discharged without a hearing.

But the State contends that Aitken was not entitled to a hearing because "jawboning"[7] is a permitted regulatory method in the State of Washington. *Liberty Bank v. Henderson*, 75 Wn. App. 546, 878 P.2d 1259 (1994), *review denied*, 126 Wn.2d 1002 (1995). In *Liberty Bank*, the CEO of a minority-owned bank was fired by his Board at the insistence of the State Banking Supervisor. The CEO filed originally in federal court, alleging civil rights claims under Section 1983, including a claim that he was terminated without a hearing in violation of an employment agreement. *FDIC v. Henderson*, 940 F.2d 465, 476 (9th Cir. 1991). The Ninth Circuit held that the State Banking Supervisor had denied the CEO his property interest without due process of law, but affirmed summary judgment for the Supervisor on the basis of qualified immunity. *Henderson*, 940 F.2d at 476-77. On remand to state court, the CEO prosecuted his remaining theories of tortious interference with his employment contract and defamation. Thus, the state court in holding that "jawboning" was a permitted regulatory practice, did so in the context of the tortious interference claim, not a constitutional claim for terminating an employment right without due process. In light of this history, we are unwilling to extend *Liberty Bank*'s approval of "jawboning" to bar Aitken's due process claim.

The State next contends that since the statute dealing with the regulation of credit unions, RCW 31.12.575, provides that a pretermination hearing is necessary only

---

[7]"Jawboning" is a term used to describe the "informal practice of threatening formal action in order to ensure bank compliance with regulatory requests." *See Liberty Bank*, 75 Wn. App. at 557.

when the regulator's *formal* powers are exercised, no due process requirement exists. The State also argues that it had no obligation to provide a hearing because the TAPCO Board, not the State, fired Aitken. We disagree.

■ ■ If due process required a pretermination hearing before firing Aitken, a statutory scheme that provided less protection is by definition inadequate. And a public official who sets in motion a series of acts that cause others to inflict the constitutional injury may be liable even though the official does not directly terminate the employee. *Merritt v. Mackey*, 827 F.2d 1368, 1371 (9th Cir. 1987).

Qualified Immunity for Section 1983 Property Interest Claim

■ ■ The State contends that even if Reed failed to provide Aitken a hearing as required by due process, she is protected by qualified immunity. Whether an official is entitled to qualified immunity is purely a question of law for the court. *Henderson*, 940 F.2d at 477 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 528, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)). The test is whether a reasonable government official, acting as Reed did, would have known that her conduct violated Aitken's clearly established constitutional right. *Merritt*, 827 F.2d at 1372-73 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). But the contours of such a right "must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). To determine such contours, the court must consider not only the general legal rule involved, but the information possessed by the government official. *Anderson*, 483 U.S. at 641. Thus, the inquiry is fact-specific and becomes: Could a reasonable government official in Reed's position have believed she was acting lawfully in light of clearly established law and with the information she possessed? *Anderson*, 483 U.S. at 641.

*Merritt v. Mackey*, 827 F.2d 1368, comes closest to telling us what the law, under similar circumstances, was at the

time of Reed's conduct. In *Merritt*, state and federal officials pressured a nonprofit drug and alcohol counseling agency to fire one of its counselors. Under state law, the counselor had a property interest in continued employment and could be terminated only "for cause." He was not given a pretermination hearing. The court denied qualified immunity to the officials because their conduct exceeded the scope of their authority, i.e., the officials had no authority, and knew they had no authority, to require the agency to terminate the counselor. In dictum, however, the court opined that the officials would not be entitled to qualified immunity even if acting within their authority.

■ At the time of Reed's actions, no court had adopted the *Merritt* dictum, and we question whether it will be adopted. Certainly a government official who acts within her authority has, and should have, a much stronger "reasonableness" argument than one who knowingly acts outside her authority. And Reed, unlike the officials in *Merritt*, was acting within her authority in dealing with TAPCO.

Furthermore, although the statutory scheme set forth in chapter 31.12 RCW does not *bar* Aitken's due process claim, its existence is relevant to the question of whether Reed acted reasonably. The statute authorizes the Supervisor to first request the Board to terminate a suspect employee. Only if the Board refuses to act, and the Supervisor formally removes the employee, is she required to afford a hearing. RCW 31.12.575(4). We believe that a reasonable official in Reed's position could rely to some extent on this statutory procedure.

Finally, and most importantly, the factual circumstances known to Reed fail to clearly define the contours of Aitken's right. First, the record does not show that Reed even knew of the provisions of the personnel manual—the source of Aitken's property right. Second, the provisions of the manual do not specifically set forth Aitken's right to be terminated only "for cause." Rather, the manual requires that certain steps be taken before dismissing an employee

"except when the Management deems immediate removal necessary in order to maintain the safety of the Credit Union." Another section of the manual requires "advance notice of corrections" before making a final decision to terminate an employee, but then provides that such notice and other disciplinary procedures do not apply in cases of "gross misconduct." Whether Aitken was or could have been terminated by the Board for "gross misconduct" or to "maintain the safety of the Credit Union," we do not know. What we do know is that the factual circumstances underlying Aitken's legal rights present at best a clouded picture. *Compare Meyer v. Fidelity Sav.*, 944 F.2d 562 (1991) (complex nature of employee's entitlement precludes finding that official violated clearly established law). We hold that measured against the standard of what was "clearly established law" and the circumstances known to Reed, a reasonable official in her position could have believed she was acting lawfully towards Aitken. She is, therefore, entitled to qualified immunity on Aitken's due process claim.

Section 1983 Liberty Interest

Aitken claims that Reed's draft charges denied him a liberty interest in his good name under the Fourteenth Amendment. To recover on this theory, Aitken must prove, among other things, that the charges were made public and that the stigma from the charges foreclosed other employment opportunities. *Codd v. Velger*, 429 U.S. 624, 626, 97 S. Ct. 882, 51 L. Ed. 2d 92 (1977). He has shown neither.

Aitken claims that publication took place when Reed presented her allegations to the TAPCO Board. We find that this is not a sufficient publication to support a Section 1983 liberty interest claim.

The constitutional liberty interest in one's good name is different from a general defamation claim—the publication must prevent one from obtaining future employment, not merely damage one's reputation. *Ratliff v. City of Milwaukee*, 795 F.2d 612, 627 (7th Cir. 1986); *Waddell v. Forney*,

108 F.3d 889, 896 (8th Cir. 1997). Reed presented her charges only to the Board. Neither she nor the Board published the charges to the general public. In fact, the Board justified its termination of Aitken by circulating a story in its newsletter that Aitken "funneled money into [his] travel agency." And although Reed substantially repeated her allegations when called to testify before a State Senate committee some months later, she was required to do so and could have been punished for contempt for refusal to testify. RCW 44.16.150. Furthermore, Aitken voluntarily appeared and addressed the charges himself at the Senate hearings.

■ In addition, Aitken has not demonstrated that he was denied employment at any other credit unions because of Reed's charges. While claiming that he has been "blackballed" in the credit union industry, and that he has been denied employment by other credit unions, Aitken provided no supporting affidavits setting forth specific instances where he has been denied employment because of Reed's charges. Moreover, Aitken conceded in an interrogatory answer that his difficulties getting other employment have stemmed from his age, not his TAPCO history. "Unsupported argumentative assertions are not sufficient to defeat summary judgment." *Vacova Co. v. Farrell*, 62 Wn. App. 386, 395, 814 P.2d 255 (1991) (citing *Blakely v. Housing Auth. of King County*, 8 Wn. App. 204, 210, 505 P.2d 151 (1973)).

Section 1983 Equal Protection Claims: Age and Gender Discrimination

Aitken has also appealed the dismissal of his Section 1983 age and gender discrimination claims. These are based upon Reed's alleged statement at a manager's meeting that, "[W]ell boys[,] this is what [you're] going to do . . .," and testimony from a former subordinate of Reed's that Reed made remarks critical of Aitken and his younger girl friend.

■ To present a *prima facie case* of *age or sex discrimination*, Aitken must produce evidence that Reed acted in a

discriminatory manner and that the discrimination was intentional. *Henderson*, 940 F.2d at 471.

The *Henderson* court held that a single remark, which could have been interpreted in a racist manner, was, without further evidence, insufficient to establish a discriminatory intent. *Henderson*, 940 F.2d at 473; *see also Rose v. Wells Fargo*, 902 F.2d 1417, 1423 (9th Cir. 1990). *Henderson* distinguished the two cases relied upon by Aitken, *Sischo-Nownejad v. Merced Community College Dist.*, 934 F.2d 1104 (9th Cir. 1991), and *Lowe v. City of Monrovia*, 775 F.2d 998 (9th Cir. 1985), because both contained substantial circumstantial indicia of discrimination in addition to questionable comments. *Henderson*, 940 F.2d at 473 n.16.

Here, assuming as we must on summary judgment that Reed made the statements, Aitken has not produced any evidence that Reed's actions towards TAPCO were motivated by discriminatory intent. The "boys" comment was addressed not to Aitken but to a group. More importantly, nothing in Reed's many later contacts with Aitken and TAPCO carried through a theme that she dealt differently with them because of Aitken's age or gender. On the contrary, as we have already discussed, the story of TAPCO's financial distress compels the conclusion that she acted only from concern for that distress. The same is true of Reed's comments about Aitken's girlfriend. There is simply no evidence that Reed's beliefs about Aitken and the girl friend played any part in her conduct. Since Aitken has made no showing of discrimination beyond these comments, the trial court properly granted summary judgment on these claims.

## Defamation & Tortious Interference with Contract

The trial court granted summary judgment on the defamation and tortious interference with contract claims, holding that Reed was protected by an absolute privilege for the statements she made to the Board regarding Aitken's removal. We agree.

In *Liberty Bank*, 75 Wn. App. 546, Division One held that the State Supervisor of Banking was entitled to an absolute privilege for statements made within the course of his official duties. *Liberty Bank* noted that:

> [F]or an official to come within the scope of this privilege, it need only be established that the proponent is "among that class of officials absolutely privileged to publish defamatory matter", and that "the publication has more than a tenuous relation to [his or her] official capacity."

*Liberty Bank*, 75 Wn. App. at 564 (quoting *Sidor v. Public Disclosure Comm'n*, 25 Wn. App. 127, 133, 607 P.2d 859 (1980)).

Here, the State Supervisor of Credit Unions is an official of the same rank as the State Supervisor of Banking in *Liberty Bank*. And Reed's statements about Aitken's operation of TAPCO had more than a tenuous relation to her official capacity. Indeed, she was performing one of her most significant duties—attempting to prevent a credit union from failing.

Where defamation and tortious interference with contract claims arise out of the same conduct, both claims are subject to the defense of privilege. *Stidham v. State Dept. Of Licensing*, 30 Wn. App. 611, 616, 637 P.2d 970 (1981).

In conclusion, we affirm summary judgment for the defendants, holding that Aitken failed to present sufficient evidence on his claims of (1) retaliation for speech, age and gender discrimination, and a liberty interest in his good name; (2) that Reed is protected by qualified immunity on Aitken's due process/property right claim; and (3) that Reed has absolute immunity against the defamation and tortious interference claims.

Affirmed.

SEINFELD and HUNT, JJ., concur.

Reconsideration denied February 24, 1998.

Review denied at 136 Wn.2d 1004 (1998).